684 F.2d 1276
 18 ERC 1273, 12 Envtl. L. Rep. 21,121
 HUMBOLDT COUNTY, a Political Subdivision of the State of
Nevada, Plaintiff-Appellant,
v.
UNITED STATES of America; Department of Interior; Bureau of
Land Management; Secretary of the Department of Interior;
Winnemucca District Manager, Bureau of Land Management;
State Director-Nevada, Bureau of Land Management; Director
Bureau of Land Management; and Chief, Division of Resources,
Bureau of Land Management, Defendants-Appellees.
 No. 80-4419.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Jan. 13, 1982.
Decided Aug. 24, 1982.
 
 Julian C. Smith, Jr., Carson City, Nev., argued for Humboldt County; Smith & Gamble, Ltd., Carson City, Nev., on brief.
 James G. Watt, Mountain States Legal Foundation, Denver, Colo., on brief, for amicus curiae.
 James C. Kilbourn, Dept. of Justice, Washington, D. C., argued for defendants-appellees; Shirley Smith, Asst. U. S. Atty., Reno, Nev., Dirk D. Snel, Atty., Washington, D. C., on brief.
 Appeal from the United States District Court for the District of Nevada.
 Before BROWNING, Chief Judge; SKOPIL, and NORRIS, Circuit Judges.
 SKOPIL, Circuit Judge:
 
 INTRODUCTION
 
 1
 Humboldt County appeals the district court's decision upholding the Bureau of Land Management's ("BLM") closure of two roads in the Blue Lake area of the county to vehicular use.[1] The County argues that: (1) it holds rights of way in the two roads under Section 8 of the Act of July 26, 1866, 43 U.S.C. § 932 (Revised Statutes 2477), (2) the BLM failed to comply with applicable federal law in closing the roads, and (3) the BLM arbitrarily denied its application for conveyance of 640 acres surrounding Blue Lake, including the two roads, for recreational and public purposes. We affirm.
 
 FACTS
 
 2
 Blue Lake is a natural scenic area in northwestern Nevada consisting of approximately 16,000 acres of BLM-administered public lands. Prior to the construction of the roads in question, Blue Lake was accessible only on foot or by horseback.
 
 
 3
 In 1952 the County proposed that a road be built through Theodore Basin to Blue Lake. The BLM prepared a Cooperative Agreement, which provided that the county would pay approximately 80% of the cost of construction and the BLM the remaining 20% and that the United States would retain title to the road.[2] Although the County did not execute the Agreement, the BLM built the road using its own equipment and employees and the County paid approximately the amount required by the Agreement. The Theodore Basin road is bulldozed but unpaved.
 
 
 4
 The second road at issue, also bulldozed but unpaved, runs from Onion Valley Reservoir to Blue Lake. The record does not clearly indicate by whom or when that road was built, other than that it was built between 1952 and 1975.
 
 
 5
 In 1971-72 the BLM held public meetings regarding the proposed classification of the Blue Lake area as a primitive area. It took no action on the classification. In 1974 the BLM held further hearings, but again did not classify the area as primitive. The BLM blockaded the Theodore Basin road in 1974 to prevent further erosion, but that blockade was ineffective. In 1977 the BLM closed the Blue Lake area, including the portions of the roads nearest the lake to vehicular use "to protect the natural values of the area until a wilderness review can be completed" and to "provide for better resource management in protecting and preserving the unique natural values of the area." See 42 Fed.Reg. 29059 (June 7, 1977) (effective July 7, 1977).
 
 
 6
 In March 1978 the County applied to the BLM pursuant to the Recreational and Public Purposes Act, 43 U.S.C. §§ 869 et seq., for conveyance of 640 acres surrounding Blue Lake, including the two closed roads, for the creation of a county park. The BLM returned the application because the County had failed to provide sufficient copies or pay the required filing fee. The County did not resubmit its application. In February 1979 the County passed a resolution declaring both roads to be public roads and claiming rights of way in them under 43 U.S.C. § 932. In March 1979 the County sued the BLM to require the reopening of the roads or the conveyance of the 640 acres.
 
 
 7
 The district court held that the County had no rights under section 932 because that section does not apply to highways that provide access to recreational areas. The court also found that the BLM had complied with federal law in closing the roads. Finally, it denied the County's request for a writ of mandamus ordering the BLM to open the roads and convey to the County the 640 acres surrounding the lake on the ground that the County had failed to exhaust its administrative remedies.
 
 DISCUSSION
 I. The County's Rights of Way
 A. Timeliness
 
 8
 After this case was submitted, amicus Sierra Club raised the question whether the County was barred from claiming a right of way in the Theodore Basin road under 28 U.S.C. § 2409a(f). The parties filed supplemental briefs on this issue.
 
 
 9
 The United States has waived sovereign immunity in any action "to adjudicate a disputed title to real property in which the United States claims an interest, other than a security interest or water rights." 28 U.S.C. § 2409a(a).[3] However, any such action must be commenced within 12 years of the date upon which it accrued, and it "shall be deemed to have accrued on the date the plaintiff or his predecessor in interest knew or should have known of the claim of the United States." 28 U.S.C. § 2409a(f). This 12-year limitation is jurisdictional and therefore cannot be waived and may be raised at any time. Park County, Montana v. United States, 626 F.2d 718, 720 (9th Cir. 1980), cert. denied, 449 U.S. 1112, 101 S.Ct. 923, 66 L.Ed.2d 841 (1981).
 
 
 10
 The Government argues that the Cooperative Agreement, by retaining title to the Theodore Basin road in the United States, gave notice to the County in 1952 of the United States' claim in that road. It concedes that the County did not have notice of the Government's claim in the Onion Valley Reservoir road until the 1970's, and that jurisdiction over the County's claim in that road is therefore proper.
 
 
 11
 The County raises two arguments with respect to the timeliness of its claim in the Theodore Basin road. First, it argues that the district court's finding that the Cooperative Agreement was presented to county officials is clearly erroneous. Second, it argues that, even if it received notice of the government's claim in 1952, the public did not. The County would have this court hear its claim as it is brought on behalf of the public, even if not as brought on its own behalf.
 
 
 12
 The County's first argument is without merit. The County paid approximately the amount called for by the Cooperative Agreement for the construction of the Theodore Basin road. Moreover, Mr. Fulwider, the BLM District Manager who signed the Agreement on behalf of the Government, testified that, although he delegated to a Mr. Perrson the job of presenting it to the County, he was sure that it was presented. Mr. Perrson was a county official appointed by the Humboldt County Fish and Game Board as its wildlife and recreation representative to a BLM advisory board. Thus, the court's finding that the Agreement was presented to county officials is not clearly erroneous. The County's second claim also lacks merit. Nothing in section 2409a(f) requires that notice be given to the public as well as to the County, the plaintiff in this case. The County's claim of a right of way in the Theodore Basin road is barred by the statute of limitations, and the district court was required to dismiss that portion of the County's appeal for lack of jurisdiction.
 
 B. Rights of way under section 932
 
 13
 The statute at issue in this case provides that: "The right of way for the construction of highways over public lands, not reserved for public uses, is hereby granted." 43 U.S.C. § 932 (Revised Statutes § 2477).[4] In interpreting this grant of rights in federal land, we must consider the condition of the country at the time of the grant, the declared purpose of the statute, and the other parts of the statute. Leo Sheep Co. v. United States, 440 U.S. 668, 682, 99 S.Ct. 1403, 1411, 59 L.Ed.2d 677 (1979). Any doubt as to the extent of the grant must be resolved in the government's favor. Andrus v. Charlestone Stone Products Co., 436 U.S. 604, 617, 98 S.Ct. 2002, 2009, 56 L.Ed.2d 570 (1978).
 
 
 14
 The crucial language of section 932 for this case is the phrase "public lands."[5] Such lands are those subject to sale or other disposal under general laws, excluding those to which any claims or rights of others have attached. Columbia Basin Land Protection Ass'n v. Schlesinger, 643 F.2d 585, 602 (9th Cir. 1981). Thus, unless the land surrounding the Onion Valley Reservoir road was public land when the road was built, the County could not have acquired any right in it under section 932.
 
 
 15
 In 1935 the Secretary of the Interior, acting under the Taylor Grazing Act of 1934, established a grazing district that included the Blue Lake area. See note 2, supra. The establishment of this district had the effect of withdrawing the Blue Lake area "from all forms of entry of settlement." 43 U.S.C. § 315. However, the Taylor Grazing Act also provided that: "Nothing contained in this chapter shall restrict the acquisition, granting or use of ... rights-of-way within grazing districts under existing law...." 43 U.S.C. § 315e. There are no cases interpreting this subsection of the Act. Therefore, it is unclear whether the establishment by the Secretary of a grazing district encompassing the Blue Lake area precluded the County from acquiring a right of way in the Onion Valley Reservoir road under section 932.
 
 
 16
 In 1934 the President withdrew all of the unappropriated and unreserved public land in several states, including Nevada, from "settlement, location, sale or entry" pending a determination of the best use of the land. Executive Order No. 6910, quoted in Executive Withdrawal Order, 55 I.D. 205, 206-207 (1935). In 1936 Congress responded to this Executive Order by amending the Taylor Grazing Act to permit the Secretary, in his discretion, to classify both lands within grazing districts and lands withdrawn by the Executive Order as proper for homesteading. 43 U.S.C. § 315f. That section provided that the affected lands "shall not be subject to disposition, settlement, or occupation until after the same have been classified and opened to entry." See generally Andrus v. Utah, 446 U.S. 500, 511-17, 100 S.Ct. 1803, 1809-12, 64 L.Ed.2d 458 (1980). Thus, the County would not be precluded from acquiring a right of way under section 932 if the requirements of section 315f were met. However, the County has not claimed that the Secretary has classified the Blue Lake area under section 315f. Thus, because of the Executive Order, the Blue Lake area was not subject to sale or disposition and was therefore not "public lands." The County did not acquire any right of way under section 932.
 
 
 17
 We also rest our decision on a reading of section 932 itself. Section 932 was passed as Section 8 of the Act of July 26, 1866, c. 262, 14 Stat. 253. Sections 1-7 of that Act opened surveyed and unsurveyed mineral lands to exploration and occupation, subject to regulations prescribed by law and to the local customs and rules of miners in the several mining districts. Specifically, they established procedures for the issuance of patents covering mineral claims. 14 Stat. 251-252. Section 9 provided that rights to use water for mining, agricultural, manufacturing, and other purposes, that are recognized by local custom or law, would be maintained and protected. It also acknowledged and confirmed the rights of way for the construction of ditches and canals for those purposes. 14 Stat. 253. Section 10 granted to homesteaders on mineral lands rights either of preemption or under the homestead laws, if no valuable mines were on the lands. Id. Section 11 authorized the Secretary of the Interior to designate and set apart such portions of those lands that are clearly agricultural. Id. Thus, although section 932 refers to rights of way without limitation as to purpose, the statute of which it was a part addressed solely mining and homesteading claims.
 
 
 18
 No cases explicitly discuss the purposes for which a right of way may be acquired under section 932. In Wilderness Society v. Morton, 479 F.2d 842 (D.C.Cir.) (en banc), cert. denied, 411 U.S. 917, 93 S.Ct. 1550, 36 L.Ed.2d 309 (1973), the court addressed a contention that the grant of a right of way to Alaska for a road to run alongside the route of the proposed Alaska pipeline was invalid because the road was not a "highway" under section 932. The appellants in that case argued that Alaska's motive was to benefit those constructing the pipeline rather than the public and that the road would not in fact be open to the public during the pipeline construction period. The court held that the history of the project demonstrated Alaska's motive to be proper and that the right of way was valid even if the road would be used temporarily only as a pipeline construction road. Id. at 883.
 
 
 19
 Wilderness Society extended section 932 to apply to rights of way to facilitate oil drilling. Such an extension was completely consonant with Congress' intent in 1866 to facilitate private mineral development. The extension of section 932 that would be required to uphold the County's claim in this case, on the other hand, goes far beyond Congress' intent. Access to Blue Lake would be purely for recreation and would have no effect on economic development. Although the County claims generally that the right of way in this case would provide access to mines and that there is, in fact, a mining claim near Blue Lake, its general claim falls far short of a showing that the Onion Valley Reservoir road would open up the Blue Lake area for mining. Its claimed right of way is therefore outside of section 932.[6]
 
 II. Authority and Procedural Compliance[7]
 
 20
 The BLM, in closing the Blue Lake area, relied on (1) 43 C.F.R. § 6010.4 (1977) (now codified at 43 C.F.R. § 8364.1 (1981)) and (2) section 603(c) of the Federal Land Policy and Management Act (FLPMA), 43 U.S.C. § 1782(c). It also noted that the closure was consistent with 43 C.F.R. § 6292.4(a) (1977) (now codified at 43 C.F.R. § 8342.2(a) (1981)), the National Environmental Policy Act, 42 U.S.C. § 4321 et seq., and Executive Order No. 11644, 3 C.F.R., 1971-1975 Comp., p. 666 (1972), reprinted in 42 U.S.C. § 4321 app. at 1724-25 (1976).
 
 A. Section 8364.1
 
 21
 This regulation permits the BLM to close areas temporarily to assure proper resource utilization, conservation, and protection.[8] The County does not contest that the closure was for the purposes prescribed in section 8364.1. It argues that: (1) the BLM lacked statutory authorization to promulgate that regulation, (2) the BLM failed to hold hearings in closing the area, and (3) the closure in this case was not "temporary" within the meaning of the regulation. The County's first argument borders on the frivolous. The BLM had ample authority to enact section 8364.1. See 43 U.S.C. §§ 1201, 1733(a). The second argument also lacks merit. Nothing in the regulation or the authorizing statutory sections requires public hearings for temporary closures.
 
 
 22
 The County's third argument is more troublesome. The Blue Lake area has been closed since July 1977. Although no cases construe section 8364.1, various sections of the FLPMA indicate that Congress did not intend to permit the BLM to close an area "temporarily" for such a long period. See 43 U.S.C. §§ 1712(e)(2) (certain decisions eliminating a principal use of land for two or more years must be reported to Congress); 1714(b)(1) (segregation of land pending a decision on its withdrawal lasts two years); 1714(e) (emergency withdrawal lasts three years). Section 8364.1 therefore does not authorize the closure in this case.
 
 B. Section 603(c)
 
 23
 The FLPMA requires the Secretary to prepare and maintain an inventory of all public lands, but it provides that the preparation and maintenance of the inventory "shall not, of itself, change or prevent change of the management or use of public lands." 43 U.S.C. § 1711(a). The statute also requires the Secretary to review roadless areas of at least 5,000 acres identified during the section 1711(a) inventory as having wilderness characteristics and recommend to the President whether those areas are suitable for preservation as wilderness. 43 U.S.C. § 1782(a). Finally, during this period of review, the Secretary "shall continue to manage such lands according to his authority under this Act and other applicable law in a manner so as not to impair the suitability of such areas for preservation as wilderness." 43 U.S.C. § 1782(c).
 
 
 24
 In this case, the BLM completed its inventory of public lands in Nevada under section 1711(a) on September 27, 1979. On November 7, 1980 the BLM designated the Blue Lake area, among others, as a wilderness study area under section 1782(a). The County and amicus MSLF argue that the non-impairment standard of section 1782(c) did not authorize the closure of the roads because that standard was not triggered until the BLM designated the Blue Lake area as a wilderness study area. That argument appears, from the face of section 1782, to be correct. It is further supported by section 1711(a), which provides that the mere preparation of an inventory does not authorize the Secretary to change the management or use of lands. However, because the Secretary has subsequently designated the Blue Lake area as a wilderness study area, the argument is moot. The County is not entitled to the re-opening of the roads at this point, whatever its position before the November 7, 1980 designation of the Blue Lake area.
 
 
 25
 The County and amicus MSLF also argue that the Blue Lake area was ineligible for designation as a wilderness study area because it was not "roadless" within the meaning of section 1782(a), see BLM's Interim Management Policy and Guidelines for Land Under Wilderness Review, 44 Fed.Reg. 72014, 72034 App. F (1979), or "wilderness" within the meaning of section 1702(i). Whatever the merit of that argument, however, the BLM has established administrative procedures for appealing a wilderness study area designation. See 45 Fed.Reg. 74070, 74071 (1980). The County has not pursued those avenues of redress within the BLM. It is therefore barred from raising this argument because it has failed to exhaust its administrative remedies.
 
 
 26
 Finally, the County argues that the BLM failed to comply with the procedural requirements of section 1782(c). That section requires the Secretary, in reviewing potential wilderness areas, to follow the procedures of section 3(d) of the Wilderness Act. Section 3(d) requires the Secretary, before submitting any recommendations to the President with respect to the suitability of any area for preservation as wilderness, to (1) give appropriate public notice of the proposed recommendation, including publication in the Federal Register and a general circulation newspaper, (2) hold public hearings, and (3) at least thirty days before a hearing, invite the governor, county officials, and federal agencies to submit their views. 16 U.S.C. § 1132(d)(1). The Government responds that, because the Blue Lake area has not been proposed for inclusion in the Wilderness System, any hearings under section 3(d) would be premature.
 
 
 27
 The Government's argument is without merit. Section 1782(a) provides that the review "shall be conducted in accordance with the procedure specified in section 3(d) of the Wilderness Act." This plainly requires that the notice and hearings under section 3(d) take place at the review stage, not when the Secretary makes his wilderness proposal to the President. Because it is undisputed that the BLM did not comply with the procedures in section 3(d), section 1782 does not authorize the closure in this case.
 
 C. § 8342.2(a) and EO 11644
 
 28
 The BLM may designate public lands as closed to off-road vehicle (ORV) use. 43 C.F.R. § 8342.1 (1981). In doing so, the BLM must "consult with interested ... parties in a manner that provides an opportunity for the public to express itself and have those views taken into account." 43 C.F.R. § 8342.2(a).[9] Executive Order No. 11644 requires the BLM to provide for public participation in the designation of areas as open or closed to ORV use.
 
 
 29
 The County raises two arguments to the BLM's reliance on section 8342.1. First, it argues that that section does not authorize the closure in this case because the BLM closed roads that had been used by ordinary vehicles, not only ORVs. We must accept the BLM's interpretation of its regulation unless it is "plainly erroneous or inconsistent with the regulation." Udall v. Tallman, 380 U.S. 1, 16-17, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965); see Ram Petroleums, Inc. v. Andrus, 658 F.2d 1349, 1353 (9th Cir. 1981).
 
 
 30
 The evidence indicates that two-wheel drive vehicles used these roads at least occasionally. However, the County's argument misses the point. The BLM may close "all public lands" to ORV use. 43 C.F.R. § 8342.1. The district court found that the BLM closed the Blue Lake area, including the two roads, to prevent ORV use. Because the area was public land within the meaning of the BLM's definition,[10] the fact that the roads may have been used by ordinary vehicles does not preclude their closure. Nor does the fact that closure to ORVs necessarily closes an area to ordinary vehicles vitiate it. We cannot say that the BLM erred in interpreting its ORV regulations to permit the closure in this case.
 
 
 31
 Second, the County argues that the BLM failed to comply with the public participation requirements of the regulation and executive order. The BLM held hearings in 1971-72 and 1974 regarding the designation of the Blue Lake area as primitive. In 1976 it surveyed Blue Lake area users and conducted an inspection tour of the lake. These measures provided an opportunity for the public to express itself and have its views considered. Thus, the closure was authorized by section 8342.2(a) and Executive Order 11644.
 
 III. Conveyance
 
 32
 In July 1978 the County applied to the BLM for the conveyance of 640 acres surrounding Blue Lake under the Recreational and Public Purposes Act, 43 U.S.C. § 869 et seq., for the creation of a county park. The BLM returned the County's application for failure to comply with procedural requirements. The County did not correct and resubmit its application because the BLM Area Manager told county representatives that it would be "inappropriate" to pass on the County's application until Congress decided whether or not to designate the Blue Lake area a wilderness area.
 
 
 33
 We agree with the County that it would have been futile to resubmit its application. Such futility excuses the County's failure to do so. United Farm Workers v. Arizona Agricultural Employment Relations Board, 669 F.2d 1249, 1253 (9th Cir. 1982); see Pence v. Kleppe, 529 F.2d 135, 143 (9th Cir. 1976). We will therefore treat the BLM's discouragement of resubmission as a final denial of the County's application. Although the district court decided this issue on exhaustion grounds, we can affirm the court on any ground presented in the record. United States v. Washington, 641 F.2d 1368, 1371 (9th Cir. 1981), cert. denied, --- U.S. ----, 102 S.Ct. 1001, 71 L.Ed.2d 294 (1982).
 
 
 34
 The Recreational and Public Purposes Act provides: "The Secretary of the Interior upon application filed by a duly qualified applicant ... may ... dispose of any public lands to a ... county ... for any public purposes...." 43 U.S.C. § 869. The Government argues that the court should not order conveyance because section 869 vests discretion in the Secretary whether to convey lands, even when the lands are eligible and a qualified applicant has applied for them. We need not decide whether the Secretary has unfettered discretion under section 869. It is clear that Congress, in providing that the Secretary "may" dispose of lands, granted him some measure of discretion. Therefore, our review of the BLM's decision not to grant the County's application is limited to a determination whether it was an abuse of discretion. 5 U.S.C. § 706(2)(A).
 
 
 35
 In this case, the BLM did not abuse its discretion in deciding to await Congress' determination of wilderness status. It would undermine the statutory scheme relating to potential wilderness lands to hold that the Secretary had to grant the County's application here. The district court's decision not to order conveyance must be affirmed.
 
 
 36
 VACATED and REMANDED in part with instructions to dismiss for lack of jurisdiction and AFFIRMED in part.
 
 
 
 [1]
 The Mountain States Legal Foundation ("MSLF"), a group of eight western states represented by their respective Attorneys General, and the Sierra Club/The Wilderness Society/Natural Resources Defense Council ("Sierra Club") have been permitted to file amicus curiae briefs
 
 
 [2]
 Such agreements are authorized by the Taylor Grazing Act of 1934, 48 Stat. 1269, codified, as amended, at 43 U.S.C. §§ 315 et seq. See 43 U.S.C. § 315a. The Secretary of the Interior created a grazing district that included the Blue Lake area on October 18, 1935. See 6 Fed.Reg. 6151 (December 2, 1941) (enlarging that district)
 
 
 [3]
 Section 2409a(a) provides that: "This section does not ... apply to or affect actions which may or could have been brought under section ( ) 1346...." Section 1346(f) provides that: "The district courts shall have exclusive original jurisdiction of civil actions under section 2409a to quiet title to an estate or interest in real property in which an interest is claimed by the United States." Thus, a literal reading of § 2409a reduces it to a nullity, because any action under that section is brought under § 1346(f). The answer to this difficulty lies in the fact that §§ 2409a and 1346(f) were enacted simultaneously. See Act of October 25, 1972, Pub.L.No.92-562, 86 Stat. 1176. Section 2409a(a) should therefore be read to exclude only those actions that could have been brought under § 1346(a)-(e)
 Even so, it is not clear that § 2409a applies here, because the district court found that one of the bases of its jurisdiction was § 1346(a)(2). That section gives the district courts concurrent jurisdiction with the Court of Claims over civil actions against the United States not exceeding $10,000 in amount "founded either upon the Constitution, or any Act of Congress, or any regulation of an executive department." 28 U.S.C. § 1346(a)(2).
 In this case, the County's claims of rights of way in the roads are essentially claims to quiet title in those roads. See McClellan v. Kimball, 623 F.2d 83, 85-86 (9th Cir. 1980). As such, they could not have been brought under § 1346(a)(2). It can be argued that the County's procedural claims could have been brought under that section. However, we need not decide that issue because, assuming they could have been, that does not preclude the application of § 2409a to the right of way claims. We read § 2409a to exclude only individual claims that could have been brought under § 1346(a)-(e), not whole actions of which part could have been brought under that section. Thus, § 2409a applies to the County's right of way claims.
 
 
 [4]
 This section was repealed by the Act of Oct. 21, 1976, Pub.L.No.94-579, Title VII, § 706(a), 90 Stat. 2793. However, all rights of way existing on the date of repeal were expressly preserved. 43 U.S.C. § 1769(a)
 
 
 [5]
 In discussing § 932, we will assume that the roads were "highways" and that the County had the requisite share in their construction to come within the statute
 
 
 [6]
 Because of our conclusion that the County has no rights of way under § 932, we need not decide the difficult question whether a right can ever be acquired under that section for a highway constructed after 1866. The authorities are virtually unanimous that such a right can be acquired, i.e., that § 932 has prospective, as well as retrospective, application. See Wilderness Society, supra, 479 F.2d at 882-84; United States v. Pruden, 172 F.2d 503, 505-06 (10th Cir. 1949) (dictum); United States v. 9947.71 Acres of Land, 220 F.Supp. 328, 335 (D.Nev.1963); Homer D. Meeds, 83 I.D. 315 (1976); Limitation of Access to Through-Highways Crossing Public Lands, 62 I.D. 158 (1955); cf. Utah Power & Light Co. v. United States, 243 U.S. 389, 37 S.Ct. 387, 61 L.Ed. 791 (1917) (implicitly assuming that § 9 of the Act of 1866 is prospective). The only authority to the contrary is a statement by this court in United States v. Dunn, 478 F.2d 443, 445 n.2 (9th Cir. 1973). In that footnote, the court concluded that a right of way could not be acquired under § 932 where the road was not yet completed. In reaching this conclusion, the court stated that:
 (T)he statute was passed to protect persons who have already encroached upon the public domain without authorization but who have been allowed to remain there with the knowledge and acquiescence of the government and who should not in conscience be deemed trespassers.
 It also quoted the Supreme Court that § 932 "was rather a voluntary recognition of a pre-existing right of possession, constituting a valid claim to its continued use, than the establishment of a new one." (citation omitted) (emphasis in original).
 Although this language in Dunn suggests that the court viewed § 932 as only retrospective, we note our doubt that the court so intended. First, the Supreme Court cases upon which the court relied held that the Act was retrospective, rejecting arguments that it was merely prospective. Thus, when the Supreme Court termed § 932 the recognition of a pre-existing right, rather than the establishment of a new one, it was in the context of a holding that a right of way dated from pre-1866 highway construction, not merely from 1866. The court was not faced with a case of highway construction after 1866. Second, the particular language in Dunn indicates that this court was not addressing prospectivity. The court referred to persons who have already encroached and who have been allowed to remain. Had the court intended to hold § 932 merely retrospective, it would have referred to persons who had already encroached and who had been allowed to remain, i.e., before 1866. Thus, Dunn does not appear to stand for the questionable proposition that § 932 is merely retrospective. However, we leave the final resolution of that question for another case.
 
 
 [7]
 Notwithstanding our holding that the County has no rights of way in either road, see Part I, supra, it has standing under the Administrative Procedure Act, 5 U.S.C. § 702, to contest the authority of the BLM to close the roads and the procedures the BLM used
 
 
 [8]
 43 C.F.R. § 8364.1 provides:
 Closure of lands.
 In the management of lands to protect the public and assure proper resource utilization, conservation, and protection, public use and travel may be temporarily restricted. For instance, areas may be closed during periods of high fire danger or unsafe conditions, or where use will interfere with or delay mineral development, timber, and livestock operations, or other authorized uses of the lands. Areas may be closed temporarily to:
 (a) Protect the public health and safety.
 (b) Prevent excessive erosion.
 (c) Prevent unnecessary destruction of plant and wildlife habitat.
 (d) Protect the natural environment.
 (e) Preserve areas having cultural or historical value.
 (f) Protect scientific studies, or preserve scientific values.
 
 
 [9]
 The BLM was permitted to act without public participation if it deemed "emergency action ... essential" to the management of the land. 43 C.F.R. §§ 6292.4(a), 6290.0-5(g) (1977) (now codified at 43 C.F.R. § 8341.2(a) (1981)). However, there is no indication that the BLM made such a determination here. That section therefore does not support the closure
 
 
 [10]
 The BLM defines "public lands" for purposes of its ORV regulations as "any lands the surface of which is administered by the (BLM)." 43 C.F.R. § 8340.0-5(b). This definition is unrelated to the definition courts use when interpreting statutes such as § 932. See Part I.B., supra. The use of the two definitions is not inconsistent in this case. It is consistent to conclude that the United States retained full rights in the area (because it is not "public lands" under § 932) and that the BLM may regulate the use of the area (because it is "public lands" under the BLM regulations)