SIERRA CLUB, a non-profit corporation; National Parks and Conservation Association, a non-profit organization; Southern Utah Wilderness Alliance, a Utah non-profit corporation, and The Wilderness Society, a District of Columbia non-profit corporation, Plaintiffs,

v.

Donald P. HODEL, in his capacity as Secretary of the United States Department of the Interior; The Department of the Interior of the United States; The Bureau of Land Management; Garfield County, a political subdivision of the State of Utah; and Harper Excavating, Inc., a Utah corporation, Defendants.

Civ. No. 87–C–0120 A.

United States District Court, D. Utah, C.D.

Nov. 30, 1987.

Wayne G. Petty, Moyle & Draper, Salt Lake City, Utah, Lori Potter, Sierra Club Legal Defense Fund, Denver, Colo., for plaintiffs.

Joseph W. Anderson, Asst. U.S. Atty. for Utah, Salt Lake City, Utah, Patrick Nolan, Panguitch, Utah, Ronald W. Thompson, Thompson, Hughes & Reber, St. George, Utah, for defendants.

## MEMORANDUM OPINION AND ORDER

### (IN LIEU OF FINDINGS OF FACT AND CONCLUSIONS OF LAW UNDER F.R.C.P. 52a)

ALDON J. ANDERSON, Senior District Judge.

### I.  INTRODUCTION

The controversy in this case focuses on a county's plans to upgrade a dirt road in southern Utah, known as the Burr Trail. The Burr Trail is a sixty-six mile road running southeasterly from the town of Boulder in central Garfield County to the Bullfrog Basin Marina on Lake Powell, just across Garfield County's southern border. This litigation concerns only the twenty-eight mile section of the road from Boulder to Capitol Reef National Park, since Garfield County's current construction plans cover only that section.[1]  Defendant Garfield County plans to facilitate travel on the trail by widening it to a two-lane road, eliminating many sharp curves, adding additional drainage to prevent flooding, improving the road base, crowning the road surface to shed rainwater, and applying a gravel surface.[2]  Plaintiffs, several environmental organizations, have brought this action to permanently enjoin the proposed construction, fearing that the changes in the road's alignment, as well as the increased traffic which could result from an improved road, will impair the naturalness and the solitude that the area now offers. Federal defendants are parties to this action because plaintiffs allege that they have failed to fulfill their responsibilities under the National Environmental Protection Act (NEPA) and the Federal Land Policy Management Act (FLPMA) to manage and preserve the federal lands through which the Burr Trail passes.  On March 10, 1987, this court granted plaintiffs' motion for a preliminary injunction pending a trial on the merits.  On June 8 and 9, 1987, the court traveled the full length of the Burr Trail from Boulder to Bullfrog and observed the regional conditions and activity.  Frequent stops were made along the road with opportunity for discussion on the record between the court, counsel, BLM District Manager Morgan

---

1.  The remainder of the road passes through Capitol Reef National Park for about sixteen miles after which it traverses federal lands for three miles and then passes through Glen Canyon National Recreation Area until it terminates at Bullfrog.

2.  Accordingly, Garfield County entered into an $850,000 contract with Harper Excavating Co. to perform the proposed construction.

It is undisputed that the county plans eventually to pave the road, and much has been made in the press about this possibility.  The court wishes to emphasize, however, that the current proposal does not call for paving.  That issue is not before the court and is not decided in this case.

Jensen, the project engineer Steve Creamer, and others. Trial commenced in late August and lasted twenty-five days.

### A. Description of the Burr Trail [3]

Garfield County enjoys few improved roads. Federal lands comprise over 90% of the county, and state lands make up an additional 6%. The Burr Trail is the only road directly connecting the Bullfrog-Ticaboo region in eastern Garfield County with the Boulder–Escalante region in the central part of the county. As a result, it is the only road directly connecting Bullfrog/Ticaboo to Panguitch, the county seat, about ninety miles away in western Garfield County. The only reasonable alternative for one traveling from Bullfrog to Boulder is to head north on Route 276 through Ticaboo about 72 miles to Hanksville, west on Route 24 about 51 miles to Torrey, and south on route 12 about 32 miles to Boulder, extending the travel time by at least an hour.

Traffic on the Burr Trail is steadily increasing. Lake Powell was formed by the construction of the Glen Canyon Dam in the 1950s and it continues to grow in popularity, attracting hikers, boaters and vacationers from all over the nation.[4] Activity at Lake Powell, combined with Ticaboo's advent as a center for uranium mining, have augmented the Burr Trail's importance as a thoroughfare. The road in its current condition, however, is inadequate to accommodate much vehicular traffic. The county hopes that an improved road will provide safer travel for its residents as well as improve the region's economy by attracting more visitors.

For easy identification in the construction plans, 1,463 locations, referred to as stations, have been marked off at regular intervals along the twenty-eight mile stretch of road on which construction is proposed. References in this opinion to points along the trail will be to these numbered "stations." From Boulder to the top of Long Canyon,[5] the left edge of the Burr Trail forms the southern boundary of the Steep Creek Wilderness Study area and the right edge of the road forms the northern boundary of the North Escalante Canyon Instant Study Area.[6] The first ten miles of the road pass over gently rolling terrain with sparse vegetation.[7] The road is relatively straight, but follows the natural undulations in the land, giving it a roller-coaster effect. The road lacks an adequate sub-base; rain and traffic cause deep ruts, impeding safe travel at speeds greater than twenty miles per hour.[8] Numerous drainage culverts have been installed throughout this section of the road, but the evidence shows that they are insufficient to carry off the rain at times of heavy storms. The plans call for about a dozen additional culverts to be installed in this section. (Exhibits D–38 and D–38A)

---

3. For the reader's benefit, two maps are appended to this opinion. The first is from the Introduction to Exhibit P–25. It shows the road's relationship to other roads and towns in the surrounding region. The second is the Project Location Map from Exhibit P–30. It traces the road as it progresses from Boulder through Deer Creek, The Gulch, Long Canyon, The Blues, the Circle Cliffs, The Flats, Capitol Reef National Park, Glen Canyon National Recreation Area and on to Bullfrog.

4. Bullfrog offers overnight lodging, restaurants, campgrounds, and even an airstrip, in addition to the marina and other lake-related facilities and services. In 1973, approximately 1.2 million people visited the Glen Canyon National Recreation Area, 70,000 of whom visited Bullfrog. By 1983, these numbers had increased to two million and 240,000, respectively, with most visitors entering by way of Arizona highways. (Exhibit P–30)

5. The first two miles of the road coming out of Boulder is already a 21-foot wide asphalt road, previously constructed by Garfield County.

6. An Instant Study Area is a primitive or natural area identified as such prior to November 1, 1975. (Exhibit P–27, p. 18) For the purposes of this opinion, both the Wilderness and Instant Study Areas will be referred to as WSAs.

   Along this stretch of road there are a few sections where the Study Areas pull back from the road quite a distance, most noticeably in the disturbed areas where the road crosses Deer Creek about seven miles out of Boulder and in a ravine known as The Gulch about three miles beyond that.

7. This section of the road is depicted in the photo album, Exhibit D–30, Volume 1, from Stations 00 to approximately 400.

8. See Stations 331 through 359.

Accordingly, the proposed construction in this section consists of cutting and filling in order to widen the traveled surface to a uniform 24 feet, building an adequate road base, crowning the road surface to shed rain, installation of adequate drainage ditches, culverts and catch basins to prevent flooding, and application of a gravel surface.[9] The cuts and fills will disturb only soil and roadside vegetation. For the most part the fill material will be taken from the cut material.

About seven miles out of Boulder, the road crosses the Deer Creek. The terrain then becomes more mountainous as the road approaches The Gulch. The hills get steeper and the road must wind through large rock formations. The road is necessarily narrower and forms some hazardous curves; in some spots, two cars cannot safely pass each other. As a result, the construction in this area requires more cutting and filling, both to widen the road and improve the grade as it descends into The Gulch. Through this area the side hill cuts will be into rock as well as soil.[10]

The Gulch, also known as The Wash, is a ravine through the bottom of which passes a stream channel. As the road descends into The Gulch, it forms a narrow hairpin curve as it turns northeastward through the riparian area in preparation for the seven-mile stretch up through Long Canyon. At times of heavy rains, water pours into The Gulch and the stream overflows and washes out the road, rendering it impassable and requiring reconstruction by county maintenance crews.[11]

The road straightens somewhat as it heads up Long Canyon.[12] The canyon is bounded on both sides by 200–foot high,

vertical, red sandstone cliffs. In some places, the canyon is only 300 feet wide; in others it opens up to a quarter of a mile or more. Passage up the canyon is obstructed by large amounts of soil and rock debris deposited against the walls on both sides, making the canyon effectively even more narrow.[13]

The stream channel which flows into the riparian area in The Gulch runs to the left of the road as one heads up the canyon.[14] This channel served as the road before the county built the present road on the right side of the canyon. The present road is much straighter and safer than the old channel road, but is still subject to flooding and washouts. Protecting the road from flooding is a major concern throughout the canyon. The plans call for removing some of the soil and rock debris to permit moving the channel farther to the left and reinforcing the side of the channel against the road with riprap protection. This will permit widening of the road with a minimum of rock blasting into the sides of the canyon. It will also help eliminate two blind curves.

Coming out of Long Canyon, the road makes a difficult curve along the side of a steep hill.[15] Here, much fill is required to provide support for two lanes, straighten the road, and build a better sub-base. As the traveler approaches the area known as The Blues, named for the coloration of the surrounding hills, an increasing amount of blue clay is encountered on the road.[16] This clay becomes very slippery when wet and renders the road more dangerous and sometimes impassable. The proposed work through this area will help provide an all-

9. While the traveled surface will be 24 feet wide, the disturbed area will be considerably wider in many places, especially around curves, since it will include the shoulders and the drainage ditches.

10. See Stations 369 through 401.

11. Doubtless, the best way to eliminate the flooding is to move the road up onto the bench to the right, out of the flood zone, but this would require a right-of-way permit from the BLM and, for that reason, Garfield County has foregone that option.

12. See Stations 420 through 680.

13. See, for example, Stations 489, 492, 575 and 608.

14. See, for example, Stations 452, 500, 621, and 658.

15. See Stations 742 through 755 in volume 2 of Exhibit D–30.

16. See Stations 418 through 554 and 738 through 756.

weather road by improving the sub-base and applying a gravel surface. The road then passes through about a mile of rocky terrain in the Circle Cliffs region, after which it levels off somewhat for the remainder of the proposed construction—approximately ten miles. Through the mile of rough terrain, the project calls for cuts, fills and some tree removal.[17] Through the remainder of the proposed construction, however, which comprises over a third of the project, the road is relatively straight and level and comparatively little work is needed.[18] The work will consist only of small amounts of fill used to widen and improve the roadbase; the road will be crowned to shed the rain and a gravel surface will be applied. About thirty drainage culverts will be installed in this section. (Exhibits D–38 and D–38A) As with the first ten miles of the project, only soil and desert vegetation will be disturbed. Indeed, through the final six miles of the project, in the area known as The Flats, the trees have already been cut back up to 50 feet or more on each side of the road in some places.[19]

When completed, the road will be able to safely accommodate speeds up to forty miles per hour, except in the area from The Gulch through The Blues, where the maximum safe speed will be thirty miles per hour.

Plaintiffs' principal concern is that the increased traffic which could result from an improved road will detract from the sense of solitude and intimacy with nature that the area now offers. Witnesses testified that the Burr Trail is unique among southern Utah dirt roads for its varied topography and unparalleled canyon wilderness experiences. Plaintiffs also claim that the project will have an adverse impact on the plants, wildlife and archaeological sites in the area.

Plaintiffs make three principal legal arguments:

1. That Garfield County does not possess a valid right-of-way and that the Bureau of Land Management, which has jurisdiction over the federal lands, has made no serious effort to determine if a valid right-of-way exists.

2. That even if Garfield County does have a right-of-way, its scope is narrowly circumscribed by the limited uses to which it has been put over the decades. For this position, plaintiffs rely both on Utah case law, which defines the scope of rights-of-way created under Section 8 of the Act of July 26, 1866, 43 U.S.C. § 932 (Revised Statutes 2477), and on the Federal Land Policy and Management Act of 1976 (FLPMA), 43 U.S.C. §§ 1701 *et seq.*, which authorized the creation of the Wilderness Study Areas adjacent to the Burr Trail and which arguably froze the right-of-way to the scope existing in October 1976.

3. That, under the National Environmental Policy Act of 1969 (NEPA), 42 U.S. C. §§ 4321 *et seq.*, the BLM's participation in the project constitutes major federal action which significantly affects the environment and therefore requires the preparation of an Environmental Impact Statement.[20]

Plaintiffs thus request the court to find that Garfield County has no right-of-way over the road and to permanently enjoin improvement of the road. Alternatively, they ask that the court declare the scope of the right-of-way to be limited to its October 1976 status, that Garfield County be required to apply to the BLM for an amended right-of-way, and that the BLM be required to prepare an Environmental Impact Statement for the project.

Plaintiffs request that the court also settle the above issues with regard to the

---

17. See Stations 756 through 809.

18. See Stations 811 through 1462.

19. See Stations 1182 through 1462. The tree removal occurred as part of a separate project in 1974.

20. Plaintiffs have withdrawn their claim under the Clean Water Act, 33 U.S.C. § 1344, that defendants must obtain a permit for the discharge of dredged or fill materials into navigable waters, since defendants have obtained the permit.

state section through which the road passes.[21]

Defendant Garfield County responds:

1. That plaintiffs have no standing to challenge the existence of Garfield County's right-of-way.

2. That the county holds a valid right-of-way under R.S. 2477.

3. That the width of the right-of-way is at least 66 feet or 100 feet, and perhaps as much as 200 feet. That Utah law permits expansion of an R.S. 2477 right-of-way as the growth of its use requires, without any permit from the BLM, and that the road's use currently requires the proposed construction.

4. That the road is a valid existing right under FLPMA and that to the extent it intrudes into a WSA it does not cause any undue or unnecessary degradation and may be completed in accordance with the plan.

5. That under NEPA, there is neither major federal action nor significant impact on the environment requiring preparation of an Environmental Impact Statement.

6. That plaintiffs have made false statements, have improperly requested a preliminary injunction in order to delay the construction, and have caused a breach of the Harper construction contract.

Federal Defendants respond:

1. That Garfield County holds a valid right-of-way over the Burr Trail.

2. That the BLM's responsibilities in the present controversy are limited to review of the proposed construction as it relates to federal interests.

3. That the proposed construction will not unduly degrade the WSAs, that Garfield County need not apply for a permit for any of the proposed construction and, therefore, that the BLM has no authority to interfere with the construction.

4. That the BLM's participation in the controversy does not amount to major federal action significantly affecting the environment and that it need not prepare an EIS.

Defendants therefore ask the court to hold that Garfield County has a valid right-of-way under R.S. 2477, to specify the width of the right-of-way, to find that all of the proposed construction is within that right-of-way, to lift the preliminary injunction, and to hold that plaintiffs have no standing to make a claim to the contrary.[22] Defendant Garfield County also asks for damages for what it claims was plaintiffs' improper request for the preliminary injunction and interference with the construction contract.

**B. Standing**

A party has standing where it demonstrates injury in fact to an interest "arguably within the zone of interests to be protected or regulated by the statute." *Data Processing Service v. Camp*, 397 U.S. 150, 153, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970). That interest may reflect aesthetic, conservational and recreational values. *Id.* at 154. Plaintiffs in this case have alleged sufficient injury to their environmental concerns to meet the injury in fact requirement. Since their interests are among those protected by NEPA, they have standing to request that an EIS be prepared. *Conservation Law Found. of New England, Inc. v. Harper*, 587 F.Supp. 357, 363 (D.Mass.1984). Since they are within the zone of interests to be protected by FLPMA, they have standing to challenge the existence, location and scope of the right-of-way as it passes through the public lands. *Sierra Club v. Watt*, 608 F.Supp. 305, 317 (E.D.Cal.1985).[23]

21. The evidence shows that the proposed construction in the state section will not adversely affect any federal interest. Consequently, this court has no legal authority to enter an order affecting construction in this section.

22. The Statute of Limitations claims of both parties were dismissed at the conclusion of plaintiffs' case. Plaintiffs had claimed that Garfield County was barred by 28 U.S.C. § 2409a(f)

from quieting title to its right-of-way. Defendants had responded that 28 U.S.C. § 2401(a) barred plaintiffs from bringing the present action.

23. Defendants claim that plaintiffs have no standing to challenge the existence of the right-of-way since that is a matter only between the county and the federal government. The court in *Cady v. Morton*, 527 F.2d 786 (9th Cir.1975),

## C. History of the Trail

The parties have disputed the extent of use and attention the trail has received over the past century, defendants claiming that the trail has received substantial use and regular maintenance, and plaintiffs claiming that it has received only sporadic use and casual maintenance. (Exhibits P–72 through P–80.) [24]

The evidence shows that the trail was first blazed in the 1880s by John Burr who used it to transport horses, sheep and cattle between Boulder and the Circle Cliffs. It continued to be used for that purpose for several decades, ostensibly under the authority of R.S. 2477, enacted in 1866. Around 1918, Long Canyon was used to get to an oil well in the Circle Cliffs area. In the mid–1930s there was considerable spring development in the Circle Cliffs area, and an effort was made to build a road that would enable horse-drawn wagons to get to them. Also in 1935 a "rescue party" took a rubber-tired wagon through Long Canyon to rescue Bernell Baker, who had a broken hip. Garfield County began to maintain the seven miles of the road from Boulder to Deer Creek in the early 1940s. In 1947, the county supplied a tractor to smooth the road and had the cooperation of the Boulder Cattlemen's Association and the BLM in the project. In 1952 the county, the BLM and the Cattlemen's Association again improved the road, this time to accommodate motor vehicles used to transport their cattle, but the project apparently was not finished at that time. Throughout the 1950s and 1960s, there was occasional uranium mining and oil drilling in the Burr Trail area. In finding that the

road has been regularly used, the court has been impressed by the testimony of Truman Lyman and Othello Barney, two men who have lived in the area their whole lives and who discussed these activities in detail.

From the 1940s through the 1960s, Garfield County expended considerable resources improving the road and, since 1979, has spent over $1 million in road maintenance (Exhibit D–109). In 1970 Garfield County and the BLM entered into a memorandum of understanding which recognized that maintenance of the road from Boulder to the Water Pocket Fold is the county's responsibility. (Exhibit D–22)

The evidence shows that over the years both the traveled path and the width of the road have varied by as much as several hundred feet from the current roadway.[25] Moreover, periodic flooding of the road has required realignment in many places. Most of these former paths are still visible off to the sides of the current road.

Traffic counts have varied considerably, depending on the time of year and the weather when the count was taken. The best estimate is that the road is currently traveled by between ten and forty cars a day, with the count exceeding a hundred a day on holidays when boating is available. As mentioned, it is expected that the traffic will continue to increase as Bullfrog Marina grows in popularity.

This controversy exists at the interface of conflicting congressional enactments. In 1866, long before the public interest in environmental concerns, Congress passed R.S. 2477, granting rights-of-way for public

---

however, held that plaintiffs' interest in the environment was sufficient to confer standing to challenge the validity of leases granted to a mining company by the Crow Indian Tribe and approved by the BIA.

The existence of the right-of-way in the present case affects the public lands and the environment just as much as the other issues in the case. If defendants had applied for a right-of-way permit, plaintiffs would have sufficient interest to challenge it. Plaintiffs have no less standing to challenge the existence of a previously granted right-of-way.

**24.** The court includes here by reference the Statement of Uncontroverted Facts in the Pre-

trial Order, paragraphs 1 through 76. This should be considered in addition to evidence presented at trial, for a more detailed recitation of the facts involved in this case. It is helpful, nonetheless, to briefly narrate the history of the trail as a basis for understanding the legal issues to be resolved.

**25.** As would be expected, the width of the road has narrowed over the years as its primary use has evolved from cattle-driving, which requires a wide path, to wagon and automobile travel which require only a narrow road. Today, cattle are trucked to and from their grazing areas.

uses in order to encourage settlement and economic development. A century later, environmental concerns prompted Congress to pass legislation restricting development of these same areas in cases where the environment might be adversely affected, and requiring federal agencies to consider carefully the environmental effects of their actions. NEPA states that it is the continuing responsibility of the federal government to coordinate programs so as to permit the widest range of beneficial uses of the land while preserving the natural aspects of our national heritage. 42 U.S.C. § 4331(b)(3) and (4). This case requires an examination of the effects these conflicting congressional mandates have on established rights-of-way.

## II. THE ROLE OF THE COURT

The procedural posture of this case presents some interesting questions. Plaintiffs ask the court to be the finder of fact on all factual issues. Since the BLM has generated no formal record, they insist that there is nothing for the court to review. On the other hand, defendants assert that the BLM's determination of Garfield County's valid right-of-way in the Burr Trail and its approval of the current proposal to upgrade the road, are supported by the law and by substantial evidence. Defendants urge that the court merely needs to review these findings, paying due deference to the agency's expertise and field experience.

### A. Scope of Review

Ordinarily, honoring plaintiffs' request that the court be the finder of fact would usurp the agency's function and would be precluded by the doctrine of primary jurisdiction. In the present case, however, the agency has already made factual findings and a record exists sufficient for the court to review.

Questions as to whether a right-of-way exists and whether major federal action is present are to be considered in the first instance by the agency, but are ultimately questions of law to be resolved by the court. On the other hand, determinations as to unnecessary degradation within the WSAs and significant impact on the environment should be resolved by the BLM because of its special expertise and fact-finding ability; the court's role is one of review. Questions regarding the scope of the right-of-way and whether there is any intrusion into the WSAs are mixed questions of law and fact. On these issues, too, the threshold responsibility is reposed in the agency because of its expertise and duty in these areas. As noted, the BLM has generated a substantial record in the present case, both administratively and in the field. The court feels that it may appropriately undertake a review of the BLM's factual findings and conclusions under these circumstances.[26]

Judicial review of an agency's environmental decisions is narrow. Nonetheless, the court must make sure that the agency has taken a "hard look" at the environmental consequences of proposed actions. *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n. 21, 96 S.Ct. 2718, 2730 n. 21, 49 L.Ed.2d 576 (1976). The Supreme Court has explained that the purpose of NEPA is "to insure a fully informed and well-considered decision." *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*, 435 U.S. 519, 558, 98 S.Ct. 1197, 1219, 55 L.Ed.2d 460 (1978). The Tenth Circuit favors application of a "reasonableness" standard rather than the more deferential "arbitrary and capricious" standard for review of agency environmental determinations. *Park County Resource Council, Inc. v. United States De-*

---

**26.** That the court should now review the BLM's factual determinations is supported by additional considerations. Even where an insufficient record exists, referral to the agency may not be appropriate where it would impede expeditious resolution of the case without a corresponding improvement in the quality of the analysis. *Mississippi Power & Light Co. v. United Gas Pipeline*, 532 F.2d 412, 419 (5th Cir.1976), *cert.* denied, 429 U.S. 1094, 97 S.Ct. 1109, 51 L.Ed.2d 541 (1977). The court should also consider retaining jurisdiction where the agency's position on the issue is already clear. *Board of Education v. Harris*, 622 F.2d 599, 607 (2d Cir.1979), *cert. denied*, 449 U.S. 1124, 101 S.Ct. 940, 67 L.Ed.2d 110 (1981). *Mississippi Power & Light*, 532 F.2d at 419.

*partment of Agriculture,* 817 F.2d 609, 621 (10th Cir.1987). This court's responsibility is to make sure that the BLM's evaluation has identified and discussed all the relevant facts and issues so as to enable the decision makers to make informed choices. *Environmental Defense Fund, Inc. v. Andrus,* 619 F.2d 1368 (10th Cir. 1980). The BLM must have made a "comprehensive, good faith, objective, and reasonable presentation" of the important criteria. *Manygoats v. Kleppe,* 558 F.2d 556, 561 (10th Cir.1977). It must demonstrate that it used its field experience in reaching a well-reasoned decision.

### B. The BLM's Participation in this Case

Throughout the planning stages of the current project, BLM District Manager Morgan Jensen represented the BLM's interests in regular meetings with Garfield County officials. On the basis of his own experience with rights-of-way and a December 4, 1985 opinion letter from the Interior Department Solicitor (Exhibit P–18), Jensen concluded that the county had a valid right-of-way. Jensen explained to county officials that he was in no position to determine whether the proposals were within the right-of-way or how the project would affect the federal lands until he saw how the construction proceeded. He foresaw no problems but said that the BLM would monitor the construction as it progressed. Jensen believed that no major federal action existed unless BLM was required to evaluate an application for a permit. Since the BLM acknowledged the right-of-way, he believed he had no authority to intervene as long as the work was within the right-of-way. Since Garfield County agreed to yield to the BLM wherever the proposed construction was beyond the scope of the right-of-way, Jensen concluded that there was no major federal action and that no Environmental Impact Statement was needed.

In issuing the preliminary injunction in March, this court instructed the county and its engineers to set the stakes delineating the boundaries of the proposed construction so that the BLM could determine whether the project fell within the right-of-way. On reviewing the stakes, Jensen issued a BLM Staff Report stating that the project was within the right-of-way except in ten places where the proposed road would not adjoin the old road. In these ten places the county would have to either pull back so as to adjoin the present road, or apply for a right-of-way amendment.[27] The county chose the former option and restaked. (Exhibits P–103 and P–125)

In a BLM Report dated April 14, 1987, District Manager Jensen expressed his opinion that the entire project, as restaked, was within the county's right-of-way.[28] (Exhibit P–103) Jensen continued to assume that the county had a valid right-of-way over the trail and that there was no federal action. He also concluded that the project would not impermissibly intrude on the Wilderness Study Areas or other federal lands, and that there would be no significant environmental impact as defined in

27. In the Staff Report (P–125), Jensen explained: "... the proposed road improvement has been aligned along the existing route in a reasonable manner and in my opinion are within the county's existing right-of-way....

"My rationale for this position is as follows:

...

"2. The county has utilized the existing road bed area to a maximum to avoid additional disturbance. In the judgment of the BLM staff, including our engineer, the proposed road improvements ... are the best available....

"3. We found no reason not to accept the county's assertion that the road has been designed to meet minimum safety standards for the speed and anticipated travel load,....

"4. Construction will be confined by the county to the areas identified and staked on the ground to avoid unnecessary disturbance and rehabilitation measures.

...

"6. The proposal is consistent with current BLM land use plans for the protection, use, and development of the areas it services."

28. Jensen has reviewed the original set of plans and has reviewed both the staking and the restaking. He has not, however, reviewed the new set of plans which reflect the restaking. Consequently, he would not have been familiar with the placement and size of certain additional culverts in the eight areas of changes. Nonetheless, the testimony clearly demonstrated his familiarity with the road and the proposed construction.

NEPA. As before, Jensen reserved the right to monitor the construction.

Plaintiffs complain that the BLM has made no serious study of the validity of the right-of-way, that Jensen has failed to adequately examine the engineer's plans, and that his finding of no significant impact on the environment is undocumented. Defendants point to Jensen's testimony to show the efforts he made to substantiate his conclusions.

Classically, a court reviewing a decision not to prepare an EIS has the benefit of an Environmental Assessment (EA) and a Finding of No Significant Impact (FONSI).[29] This case is not the classic case, however. Neither an EIS nor an Environmental Assessment has been prepared for the present project. Nonetheless, the court is confident that the evidence and testimony presented at trial are sufficient for the court to review. The record before the court included a recitation of the decisions the BLM reached before trial and the facts supporting those decisions. Except for the ten places where the BLM instructed Garfield County to restake, the BLM's conclusions supported defendants' claims.

### III. EXISTENCE OF THE RIGHT-OF-WAY

■ In 1866, Congress enacted Revised Statute 2477, 43 U.S.C. § 932, which provided: "The right-of-way for the construction of highways over public lands, not reserved for public uses, is hereby granted." Under R.S. 2477, a right-of-way could be established by public use under terms provided by state law. *Wilkenson v. U.S. Department of Interior,* 634 F.Supp. 1265, 1272 (D.Colo.1986). *United States v. 9,947.71 Acres of Land,* 220 F.Supp. 328, 335 (D.Nev.1963). No action by public authorities was required. *Wilderness Soc'y v. Morton,* 479 F.2d 842, 882 (D.C.Cir.1973) *cert. denied,* 411 U.S. 917, 93 S.Ct. 1550, 36 L.Ed.2d 309 (1973); *Brown v. Jolley,* 153

Colo. 530, 387 P.2d 278 (1963); *Lovelace v. Hightower,* 50 N.M. 50, 168 P.2d 864 (1946). Under Utah law, an R.S. 2477 grant became a public highway by dedication through "continued use of the road by the public for such length of time and under such circumstances as to clearly indicate an intention on the part of the public to accept the grant." *Lindsay Land & Livestock Co. v. Churnos,* 75 Utah 384, 285 P. 646, 648 (1929). See also *Boyer v. Clark,* 7 Utah 2d 395, 326 P.2d 107, 109 (1958); *Jeremy v. Bertagnole,* 101 Utah 1, 116 P.2d 420, 423 (1941). The evidence in this case shows that the Burr Trail has been regularly used by cattlemen, farmers, spring developers, oilmen and mining interests, as well as other residents of Garfield County since the 1880s in a manner consistent with growing development and technology. Defendants correctly note that, under Utah law, this use was effective to accept and dedicate the road to the public use as a highway.

■ Plaintiffs contend that Executive Order 6910 withdrew the right-of-way in 1934. E.O. 6910 withdrew from settlement, location, sale or entry all of the unappropriated and unreserved public land in the state of Utah, and reserved such land for classification, conservation and development of natural resources. Nothing in the order suggests, however, that a valid right-of-way, already accepted as a public highway, was to be revoked. Indeed, such attempted revocation would be contrary to law. The evidence shows that by 1934, cattlemen and oilmen had accepted and established a right-of-way over the Burr Trail.

Plaintiffs also argue that in 1935, the Secretary of the Interior, acting under the Taylor Grazing Act of 1934, 48 Stat. 1269, codified as amended at 43 U.S.C. §§ 315 *et seq.,* established a grazing district over parts of the Burr Trail. The Act explicitly

---

**29.** The federal agency itself is to determine whether an EIS is required. *Kleppe v. Sierra Club,* 427 U.S. 390, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976); *City of Aurora v. Hunt,* 749 F.2d 1457 (10th Cir.1984). It is generally held that a decision not to prepare an EIS must be supported by a statement of reasons. *City of West Chicago v. U.S. Nuclear Regulatory Comm'n,* 701 F.2d 632 (7th Cir.1983). But where the reasons for the decision not to prepare an EIS are obvious, no statement is necessary. *Krueger v. Morton,* 539 F.2d 235 (D.C.Cir.1976).

provided, however, that "[n]othing contained in this subchapter shall restrict the acquisition, granting or use of permits or rights-of-way within grazing districts under existing law." 43 U.S.C. § 315e. *Humboldt County v. United States*, 684 F.2d 1276, 1281 (9th Cir.1982). The Act also provided that it did not diminish, restrict or impair any right which was part of a grant to a state. 43 U.S.C. § 315. Moreover, Executive Order 7279 exempted from the pale of E.O. 6910 any areas which were designated as grazing districts.

There is, therefore, nothing in any of the enactments or executive orders of the mid-1930s to suggest that Garfield County lost its established right-of-way over the Burr Trail. Not only has the public regularly used the trail for over a hundred years, but Garfield County has regularly maintained and improved it for close to fifty. That none of these activities has been contested by federal authorities evinces an understanding on the part of all concerned that Garfield County has at all times held a valid right-of-way. As the court said in *Wilkenson*, 634 F.Supp. at 1275: "It follows that the laying out by authority of the state law of the road here in question created rights of continuing user to which the government must be deemed to have assented."

The BLM Manual, Rel. 2-229, June 30, 1986 (Exhibit P-19) states:

> When public funds have been spent on the road it shall be considered a public road. When the history of a road is unknown or questionable, its existence in a condition suitable for public use is evidence that construction sufficient to cause a grant under RS 2477 has taken place.

Indeed, Garfield County and the BLM entered into a memorandum of understanding on February 12, 1970 in which the BLM recognized the Burr Trail to be a county road rather than a road used primarily for the management of public lands. (Exhibit D-22.) This acquiescence also appears in the Interior Department Solicitor's letter of December 4, 1985 (Exhibit P-18), expressing his opinion that the right-of-way is valid, and is further reflected in the testimony of Roland Robison, Utah state BLM director, expressing his view that Garfield County has a valid right-of-way over the Burr Trail.[30]

The court finds that the establishment and acceptance of the Burr Trail as an R.S. 2477 right-of-way is supported by overwhelming evidence. The court concludes that on the facts before the court and the applicable law, Garfield County holds a valid right-of-way over the Burr Trail.

## IV. SCOPE OF THE RIGHT-OF-WAY

In determining whether the proposed construction is within the county's right-of-way, three different types of deviations from the existing roadway must be considered individually: widening of the road, deviations from the present road which nonetheless adjoin it, and deviations which do not adjoin the road at all.[31]

The BLM Manual, Rel. 2-229 provides:

**30.** Plaintiffs correctly note that FLPMA repealed R.S. 2477 in 1976. 43 U.S.C. § 1701 note (a) provides, however:

"(a) Nothing in this Act ... shall be construed as terminating any valid lease, permit, patent, right-of-way, or other land use right or authorization existing on the date of approval of this Act [Oct. 21, 1976]."

43 U.S.C. § 1769 provides: "Nothing in this subchapter [IV] shall have the effect of terminating any right-of-way heretofore issued, granted or permitted." The repeal had the effect only of precluding any future grants. *City & County of Denver v. Bergland*, 695 F.2d 465, 475–6 (10th Cir.1982); *Humboldt County*, 684 F.2d at 1280, nt. 4). It did not revoke those grants already in existence, nor did it apply to extension of extant

rights-of-way. *Denver v. Bergland*, 695 F.2d at 481. 43 C.F.R. § 2801.4, Fed'l Register, Vol. 51, No. 37 p. 6542 provides: "In carrying out the Department's management responsibilities, the authorized officer will be careful to avoid any action that will diminish or reduce the rights conferred under a right-of-way grant issued prior to October 21, 1976."

**31.** As long as the project stays within the county's right-of-way, no BLM authorization is needed for construction to proceed. In *Denver v. Bergland*, 695 F.2d at 479, the court said:

"... Denver has acted within the scope of its right of way grant, and no further authorization is required to continue such use. Consequently, inasmuch as Denver was conducting an authorized use under a valid grant, the

State law specifying widths of public highways within the State shall be utilized by the authorized officer to determine the width of the RS 2477 grant. Where state law does not specify the width of public highways, the authorized officer shall use the width required for the road uses existing at the time of its acceptance as a public highway, or the repeal of RS 2477.[32]

The Utah Supreme Court has declared the width of an R.S. 2477 right-of-way to be that which is reasonable and necessary for the type of use to which the road has been put. *Lindsay Livestock*, 295 P. at 649. The court has also said that rights-of-way should not be restricted to the actual beaten path, but should be widened to meet the exigencies of increased travel. More specifically, they should be wide enough to allow travelers to pass each other. *Whitesides v. Green*, 13 Utah 341, 44 P. 1032, 1033 (1896). *See also Schaer v. State*, 657 P.2d 1337, 1342 (Utah 1983); *Memmott v. Anderson*, 642 P.2d 750 (Utah 1982); *Deseret Livestock Co. v. Sharp*, 123 Utah 353, 259 P.2d 607 (1953); *Jeremy v. Bertagnole*, 116 P.2d at 423.

As to deviations from the existing path, the court has said:

> While the public cannot acquire a right by use to pass over a tract of land generally, but only in a certain line or way, it is not indispensable to the acquisition of the right that there should be no deviation in the use from a direct line of travel. If the travel has remained substantially unchanged, and the practical identity of the road preserved, it is sufficient, although there may have been slight deviations from the common way

to avoid encroachments, obstacles, or obstructions upon the road.

*Lindsay Livestock*, 285 P. at 649. Further support for this position lies in the court's aforementioned declarations that the road need not be restricted to the beaten path.

As a matter of state law, therefore, the Burr Trail may be widened into a two-lane road and may deviate from the present path, as long as such extensions are reasonable and necessary.

Whether the proposed construction is actually reasonable and necessary is for the BLM to decide and for this court only to review. In *City & County of Denver v. Bergland*, 695 F.2d 465, 481 (10th Cir. 1982), this circuit held that the initial determination of whether activity falls within an established right-of-way is to be made by the BLM and not by the court. The court should pay considerable deference to the BLM's experience in examining the stakes, determining traffic patterns and evaluating the impact of the project on the surrounding environment. *Id.* at 477. In the BLM Staff Report of April 14, 1987, District Manager Jensen concluded that all of the proposed deviations were within the right-of-way. (Exhibit P-103) In preparing this report, he traveled the entire length of the project and took measurements at stations every 363 feet along the road. (Exhibit P-125.) He evaluated the disturbed areas, road safety, traffic patterns, the uses to which the road has been put, and riparian concerns, to name just a few. Jensen's conclusions were supported at trial by the testimony of state BLM Director Roland Robison.

It is clear that the burgeoning use of the Burr Trail as a route to Bullfrog necessi-

---

USFS had no authority to order Denver to stop construction."

The county must apply to the BLM for a permit for any construction activity which substantially deviates from its right-of-way. 43 C.F.R. § 2803.2(b) and § 2803.6–1(a); BLM Manual, Rel. 2–229. Section 2803.2(b) defines "substantial deviation" as follows:

(1) With respect to location, the holder has constructed the authorized facility outside the prescribed boundaries of the right-of-way authorized by the instant grant or permit.

(2) With respect to use, the holder has changed or modified the authorized use by adding equipment, overhead or underground lines, pipelines, structures or other facilities not authorized in the instant grant or permit.

32.  43 C.F.R. § 2800.0–5(c) defines "authorized officer" as "any employee of the Bureau of Land Management to whom has been delegated the authority to perform the duties described in this part."

tates a two-lane roadway.[33] It is also evident from the testimony of R Steve Creamer, the project engineer, and regular users of the trail that the roadway as it now exists is unsafe for the increasing travel, particularly when wet or snow-covered. Engineers and road experts also testified that elimination of the curves in the road, leveling of the road's vertical alignment, and installation of drainage culverts and ditches are necessary for a safe roadway and that, from an engineering standpoint, none of the proposed construction is unreasonable or unwarranted. They also testified that the proposed construction is minimally necessary to meet the standards set by the American Association of State Highway and Transportation Officials (AASHTO) for a road of this type.[34]

Moreover, the project is entirely consistent with the historic physical alignment of the road. The proposed deviations are minor in relation to the realignments which have been made in the past in response to flooding and rock slides. All of the proposed deviations adjoin the existing road, as compared to prior route changes which sometimes moved the road as much as 100 feet or more.[35]

Plaintiffs claim that Jensen's findings are unreliable because he did not study the second set of plans, relying only on the staking, and therefore did not consider certain roadside ditches which will fall outside the staking. The court finds, however, that even allowing for these drainage ditches, the project falls within the right-of-way as prescribed by Utah law. Sound engineering practice, the evidence shows, requires the proposed system of culverts and drains for safe use and maintenance of the road. Hence, the drainage is part of the reasonable and necessary use.

Plaintiffs also insist that Garfield County's objective in improving the road is the promotion of tourism and that such a purpose is beyond the use Congress intended for R.S. 2477 rights-of-way. They cite *City & County of Denver v. Bergland,* 517 F.Supp. 155, 186 (D.Colo.1981) *aff'd in part, reversed in part,* 695 F.2d 465 (10th Cir.1982), in which the trial court stated that a right-of-way under R.S. 2477 exists only for the purpose originally granted. They also cite *Humboldt County,* 684 F.2d at 1282, which held that R.S. 2477 was designed to promote economic development and that since providing access to a lake is a purely recreational function, road expan-

---

**33.** Section 27–12–93 of the Utah Code provides: "The width of rights-of-way for public highways shall be such as the highway authorities of the state, counties, cities or towns may determine for such highways under their respective jurisdiction." On June 15, 1987, the Garfield County Commission adopted a resolution setting the width of all R.S. 2477 roads within the county at a minimum of 100 feet, and defendants ask the court to set the width of the road accordingly. The court is in no position to do this, however, since the resolution was passed after the issues in this case were already framed.

Since the scope of a right-of-way at any particular time is that which is reasonable and necessary under the circumstances, it cannot be set without reference to the county's needs at that time. The width can be determined only on a case-by-case basis. The BLM has made no findings as to the validity of a 100–foot right-of-way, and evidence at trial addressed only the current proposal. The court holds only that the proposed construction is within the bounds of what is reasonable and necessary under the present circumstances.

**34.** Generally, AASHTO sets standards for width, speed, stopping sight distance, passing sight dis-

tance, shoulders, grade, and drainage. (Exhibits P–45 and D–69.) It should also be noted that the road as proposed would meet the National Park Standards. Indeed, the section of the road which passes through Capitol Reef National Park and the section coming into Bullfrog, known as the Stratton Road, are already 26–foot wide, gravel roads of the same type as Garfield County's proposal.

**35.** In reviewing the stakes of the proposed road following the preliminary injunction hearing, District Manager Jensen found ten areas where he felt the project would impermissibly deviate from the right-of-way. Using contiguity as the touchstone, Jensen found all non-adjoining deviations to be beyond the scope of the right-of-way. (Exhibit P–125) The county then modified its plans to make them conform to Jensen's findings. Since the non-adjoining deviations are not part of the current plans, the court makes no findings concerning them. It does note, however, that Jensen's interpretation of Utah law is more restrictive than the Utah Supreme Court's declarations in that the Supreme Court would appear to permit non-adjoining deviations, as long as they were reasonable and necessary.

sion for that purpose would not be within the right-of-way granted.

The scope of a right-of-way, however, reflects the uses to which the road has traditionally been put rather than the particular use Congress may have had in mind when it made the grant. As the court said in *Lindsay Livestock*, 285 P. at 648:

> We think the evidence established a general public use of the road. If the claim rested alone upon the use of the road for sawmill purposes, or for mining purposes, or for the trailing of sheep, the question would be more difficult. But here the road connected two points between which there was occasion for considerable public travel. The road was a public convenience.

And even if the right-of-way were restricted to use for economic development as plaintiffs claim, it would still encompass the proposed changes since the promotion of tourism is a form of economic development. The fact that the nature of the economy has evolved from sheep and cattle-driving to meeting the public's recreational needs does not alter this result. Bullfrog Marina was not built by Garfield County. The county is merely responding to the changing needs of the public by providing for safe travel, as it is obliged to do. Moreover, it is an oversimplification to characterize Garfield County's goal as the promotion of tourism. As noted, the road is a vital link between the county's major centers of activity.

## V. EFFECT OF THE WILDERNESS STUDY AREAS ON THE RIGHT–OF–WAY

■ What has been said thus far in this opinion has examined only those restrictions upon the scope of the county's right-of-way which are imposed by state right-of-way law. The court has not yet discussed other restrictions upon the county's rights. About 30% of the proposed construction in this project will occur where the road is bounded on each side by a Wilderness Study Area (WSA). Since the boundaries of the WSAs are defined by the edges of the road itself, and since any intrusion onto a WSA must be considered very carefully, this case requires a close examination of the applicable law at this interface.[36]

Wilderness Study Areas are governed by the Federal Land Policy and Management Act (FLPMA), 43 U.S.C. §§ 1701 *et seq.* Under the Act, all roadless areas of 5,000 acres or more which meet the criteria of the 1964 Wilderness Act are to be designated WSAs.[37] Within fifteen years, the BLM is to review each WSA and recommend to the President whether it should be classified as a Wilderness Area. Ample opportunity for public comment exists throughout this recommendation period. The President will then make his own recommendation to Congress which makes the final decision. 43 U.S.C. § 1782. During this process, while the area is still a WSA, the Secretary of the Interior is instructed to "take any action required to prevent unnecessary or undue degradation of the lands" and "to manage such lands ... in a manner

**36.** It is undisputed that the WSAs extend to the edge of the Burr Trail. There is disagreement, however, as to what is meant by "the edge": the boundary of the traveled surface, the pile of dirt left by a grader as it goes by, or even the perimeter of the disturbed area. The Wilderness Inventory Handbook (Exhibit P–98) says that old trails are deemed not substantially noticeable and should, therefore, be included in WSAs. The Handbook Clarifications (Exhibits P–100 and P–101) further explain that the WSA boundaries are to be drawn as closely as possible to the physical edge of the human imprint and are to exclude as little adjacent land as possible. On the other hand, official narrative descriptions published by the BLM (Exhibits P–88 and P–90) and District Manager Jensen's testimony show that it is the old alignment of the trail rather than the edge of the new align-

ment which forms the WSA boundary in many places. Jensen testified that some old roads were included in the WSAs and others were not. The only conclusion to be drawn from the evidence is, as Jensen explained at trial, that the boundaries were not drawn with precision. No one ever suspected that they would be subjected to such close scrutiny since the road is not in the WSAs but runs between them.

**37.** To qualify as a WSA under the Wilderness Act, the area must have been affected primarily by the forces of nature, with the imprint of man's work substantially unnoticeable, and must have outstanding opportunities for solitude or a primitive and unconfined type of recreation. 16 U.S.C. § 1131 *et seq.*

so as not to impair the suitability of such areas for preservation as a wilderness." *Id.* § 1782(c).

The Act expressly permits the continuation of mining, mineral leasing and grazing uses in the same manner and degree existing on October 21, 1976, the effective date of the Act. *Id.* § 1782(c). It also provides: "Nothing in this Act ... shall be construed as terminating any valid lease, permit, patent, right-of-way, or other land use right or authorization existing on the date of approval of this Act." *Id.* § 1701, note (a). In the statute, Congress failed to offer standards for the preservation of rights-of-way as it did for mining and grazing rights.[38] In 1979, the BLM corrected this deficiency in its Interim Management Policy (Exhibit DG–49), explaining in considerable detail the nature and extent of the rights preserved, both in rights-of-way and in mining and grazing areas.

As explained in the Interim Management Policy (IMP), the "undue degradation" standard applies to all activity within WSAs. The lands may not, under any circumstances, be unnecessarily or unduly degraded. Additionally, all activities are subject to one of the following three standards: the non-impairment standard, the grandfathered use standard, or the valid existing right standard.

The non-impairment standard applies to all activities which are neither grandfathered uses nor valid existing rights. These activities may not impair the suitability of the WSA for designation as wilderness.

Grandfathered uses are mining, mineral leasing, and grazing as provided in the statute. They may continue in the same manner and degree as they were being conducted on October 21, 1976. Valid existing rights are defined in the Revised

IMP (Exhibit DG–50). It specifically states that right-of-way authorizations are valid existing rights. Revised IMP, p. 12. It then explains:

> Valid existing rights limit the nonimpairment standard. Although the nonimpairment standard remains the norm, valid existing rights that include the right to develop may not be restricted to the point where the restriction unreasonably interferes with enjoyment of the benefit of the right.... When it is determined that the rights conveyed can be enjoyed only through activities that will impair wilderness suitability, the activities will be regulated to prevent unnecessary or undue degradation. Nevertheless, even if such activities impair the area's wilderness suitability, they must be allowed to proceed.

Thus, an activity conducted pursuant to a valid existing right may not be permitted to unduly degrade the WSA, but it may impair its suitability for wilderness classification. If such impairment does occur, the BLM may regulate the activity, but such regulation may not unreasonably interfere with the enjoyment of the right. Assuming, arguendo, that Garfield County's proposed construction would impair the land's suitability, BLM regulation could still not unreasonably interfere with the county's enjoyment of its right-of-way.

Part IV of this opinion has already discussed those uses which are reasonable under present circumstances. Reasonable use of the Burr Trail includes the right to a safe, two-lane gravel road of sufficient construction to accommodate regular traffic. All of the construction now proposed is reasonable under Utah law. Thus, the BLM may restrict the project under FLPMA only if it unduly degrades the WSAs. Impairment alone is insufficient to trigger regulation.[39] District Manager Jen-

---

38. This silence presumably reflected the fact that Congress did not contemplate the presence of rights-of-way in WSAs since, by definition, WSAs are roadless areas.

39. The touchstone of non-impairment is that the WSA not be rendered unfit for wilderness classification. The IMP says that activities which provide the minimum necessary facilities for

public enjoyment are considered to be non-impairing. IMP p. 10 Jensen found that the Burr Trail project will not impair the WSAs' suitability for wilderness. In evaluating the proposed activity, it is the effect on the WSA as a whole which must be considered. The proposed construction will occur only at the very edge of the WSAs which together contain over 122,000 acres.

sen testified that the term "unnecessary or undue" means that all projects must employ the latest available technology and the least degrading alternatives. On this basis, Jensen determined that the project will not unnecessarily or unduly degrade the WSAs.

The IMP offers further guidance. For grandfathered uses, it draws a distinction between mineral uses and grazing uses, permitting expansion beyond actual on-the-ground disturbance as of October 1976 for the former but not for the latter. It explains that mineral uses inherently require a geographic extension to yield their full economic value while grazing does not. On the basis of this distinction, the court feels that rights-of-way are more nearly analogous to mineral activity than to grazing.

As to mineral uses, the IMP says that allowing continuation of uses in the "same manner and degree" existing in October 1976 means that "the use may proceed by a logical pace and progression—either a geographic extension or a change in the type of activity, ... not of a significantly different kind than the impacts existing on October 21, 1976 ... even if the activity impairs wilderness suitability." IMP p. 8. Elsewhere the IMP says: "It is the kind of impact, rather than the quantity of impact or the stage of development, that will be controlling in determining the manner and degree." Id. p. 12. By way of explanation, it says, "In determining whether the kind of impact is significantly different, consideration should be given to degradation of the area's wilderness characteristics, including changes in natural contours and visual impacts." Id. p. 12. Elsewhere it says that, in all cases, "[T]he benchmark is the physical and aesthetic impact on October 21, 1976." Id. p. 8.

Drawing out the analogy between Garfield County's right-of-way and existing mineral uses, the Burr Trail project reflects a reasonable pace and progression of the uses to which the trail has been put. Since the issue of significant impact is discussed at length later in this opinion, it is now sufficient to observe that the project's impacts will not be of a significantly different kind than those which have existed for decades. The road will be, as it has been for years, a traveled road, albeit wider, straighter, and with a gravel surface. Engineering testimony indicates that fill areas will match the coloration of the surrounding area, rock blasting techniques will reflect environmental concerns, and visual impacts throughout the project will be mitigated.

The Statewide Wilderness Draft EIS prepared in January 1986 examined which of the WSA lands should be classified as Wilderness Areas. (Exhibit P–28) No specific project was considered, but three alternatives were evaluated: classifying none of the lands as wilderness, classifying all of the lands as wilderness, and classifying most of the lands as wilderness. (Exhibit P–28, see North Escalante Canyon/The Gulch ISA, Table 1, p. 20) For both the Steep Creek and the North Escalante Canyon Study Areas, the BLM recommends the third option, known as the Partial Wilderness alternative. The goal of the Partial Wilderness alternative is to minimize conflicts between the WSAs and the Burr Trail. It provides that the Wilderness Areas will be set back from the trail a quarter of a mile. In arriving at its recommendation, the BLM expressly contemplated realignment and paving of the Burr Trail. Nowhere in the Draft EIS is it suggested that the BLM can, or should, oppose realignment or paving. Even under the All Wilderness alternative, a hundred-foot border was to be reserved on both sides of the trail for road maintenance, and realignment of the road was anticipated as likely within this corridor. The report acknowledges that up to 50 acres could be disturbed by the realignment, but it says that the effects of soil loss would be imperceptible.

In *State of Utah v. Andrus,* 486 F.Supp. 995 (D. Utah 1979), this court interpreted FLPMA as authorizing the BLM to apply the non-impairment standard to the state's right of access to school trust lands, where the right was not an existing use in October 1976. Since the decision preceded publication of the IMP, the court did not consider the applicability of valid existing rights. Nonetheless, the court held that

the regulation could not be "so narrowly restrictive as to render the lands incapable of their full economic development." *Id.* at 1009. The court said:

"It is clear that the Congress intended to provide a balanced solution to the problem of land management during the inventory process. While Congress did not intend the use of public lands to be frozen pending the outcome of the inventory process, neither did it want future uses to be foreclosed by the impact of present activity." *Id.* at 1007.

Consistent with District Manager Jensen's testimony in this case that non-impairment is to be measured in the context of the WSA as a whole, the court in *Andrus* observed:

[I]t would be impossible for BLM to carry out the purposes of the Act if each particular management decision were evaluated separately. It is only by looking at the overall use of the public lands that one can accurately assess whether or not BLM is carrying out the broad purposes of the statute.... BLM is not obliged to, and indeed cannot, reflect all the purposes of FLPMA in each management action. *Id.* at 1003.

In *Rocky Mountain Oil and Gas Association v. Watt*, 696 F.2d 734, 738 (10th Cir.1982), the court said:

The FLPMA requires Interior to recognize competing values.... It represents an attempt by Congress to balance the use of the public lands by interests as diverse as the lands themselves. Accordingly, Congress provided that the BLM should manage the public lands by using the Act's procedures in a dynamic, evolving manner to accommodate these competing demands.

The court is impressed with District Manager Jensen's expertise and familiarity with the project. He has brought his thirty years of experience with the BLM and twelve years as District Manager of the Cedar City District to bear upon this controversy. He and three experienced BLM staff members traveled the entire course of the project and reviewed it station by station. They took measurements at 402 of the 1,463 stations, or roughly every 363 feet along the twenty-eight mile project. (Exhibit P–125) Jensen has worked closely with engineers and county officials throughout the planning stages of the project. His conclusion that it will not unduly degrade the WSAs was affirmed at trial by state BLM Director Roland Robison, and must be given considerable deference. The court finds that District Manager Jensen's conclusion that the Burr Trail project will not unduly degrade the WSAs was a fully informed and well considered decision and reflected the "hard look" that is required of agency environmental determinations. It further finds that his conclusion is supported by persuasive evidence.

■ One section of the road causes some concern, however. While there is conflicting evidence as to whether the North Escalante Canyon WSA abuts the road in The Gulch, the court feels that traffic and periodic maintenance work in the riparian area of The Gulch will have an impact on the WSA sufficient to invoke the FLPMA requirement that all work done be the least degrading alternative. District Manager Jensen believes that the current proposal for The Gulch is not the least degrading alternative. He believes that moving the road out of the riparian area in The Gulch up onto the bench on the right will result in less disturbance to the riparian habitat and will prevent flooding of the road. Movement onto the bench will require a permit from the BLM. The court holds that FLPMA requires the county to apply for such a permit and to work with the BLM to develop the least degrading alternative for The Gulch area.

Pursuant to FLPMA the court concludes that Garfield County has a valid existing right in the Burr Trail, that all of the proposed construction is reasonable and necessary and that, except for the riparian area in The Gulch, there will be no unnecessary or undue degradation. The county should apply for a permit to move the road from the riparian area up onto the bench.

## VI. THE NEED FOR AN ENVIRONMENTAL IMPACT STATEMENT

The court has already explained that no Environmental Assessment is necessary

since the record is sufficient for the court to review the BLM's decision not to prepare an Environmental Impact Statement (EIS). The court has already discussed the approppriate standard of review for this case in Part II–A of this opinion. The court must make sure that the BLM has made "a fully informed and well-considered decision." *Vermont Yankee*, 435 U.S. at 558, 98 S.Ct. at 1219. Questions of law are freely reviewable, *Department of Wildlife Conservation v. Jantzen*, 621 F.Supp. at 840, while agency decisions on mixed questions of law and fact should be given deference. *Alexander v. Federal Energy Regulatory Commission*, 609 F.2d 543 (D.C.Cir. 1979). But the deference given the agency's decision on a mixed question of law and fact is not absolute. *Castorina v. Lykes Bros. S.S. Co., Inc.*, 578 F.Supp. 1153, 1159 (S.D.Tex.1984), *aff'd*, 758 F.2d 1025 (5th Cir.1985), *cert. denied*, 474 U.S. 846, 106 S.Ct. 137, 88 L.Ed.2d 113 (1985).

The BLM is required to prepare an EIS for all major federal actions in which it is involved which significantly affect the quality of the human environment. 42 U.S.C. § 4332. In the present case, the BLM has determined that neither major federal action nor significant impact exists. The question of major federal action requires a factual determination by the agency as to whether its participation rises to the level the law contemplates for "major federal action." It is thus a question of law to be resolved ultimately by the court. The question of significant impact on the other hand is largely factual and the court's role is one of review.

### A. Major Federal Action

■ The following participation by the BLM in the Burr Trail project, plaintiffs assert, constitutes major federal action: attendance at Garfield County planning meetings, expressing its opinion that Garfield County has a valid right-of-way, reviewing the stakes laid by engineers along the trail, determining that the project is entirely within the county's right-of-way, concluding that FLPMA does not restrict the

project, and promising to monitor the construction as it progresses.

Title 40 C.F.R. § 1508.18(b) states that actions approved by permit or other regulatory decision are federal action. Section 1508.18 says that "actions" include activities entirely or partly financed, assisted, conducted, regulated or approved by federal agencies. It also provides that major federal action includes those acts "with effects that may be major and which are potentially subject to federal control and responsibility.... Actions include the circumstance where the responsible officials fail to act."

In *Denver v. Bergland*, 695 F.2d at 482, the Tenth Circuit expressly held that "the requirements of NEPA do apply to the BLM's consideration of Denver's deviation" from its right-of-way. While this seems to be dispositive of the issue of major federal action in the present case, further discussion is helpful since there are conflicting views on the subject.

Federal agency approval of state or private action is one form of federal action. In the landmark case of *Davis v. Morton*, 469 F.2d 593 (10th Cir.1972), the Pueblo Indians leased restricted Indian lands to a development company and the BLM approved the lease. Emphasizing Congress' concern for environmental protection, the court held that BLM approval constituted major federal action even though the federal government neither initiated the lease nor participated in it financially. In *Scenic Rivers Association of Oklahoma v. Lynn*, 520 F.2d 240 (10th Cir.1975), *rev'd on other grounds*, 426 U.S. 776, 96 S.Ct. 2430, 49 L.Ed.2d 205 (1976), HUD and the Office of Interstate Land Sales Registration were required to review an application made by certain developers under the Interstate Land Sales Full Disclosure Act. Failure to obtain the agencies' approval would preclude the developers' raising funds in interstate commerce. The court again held that the agencies' ability to suspend private action amounted to major federal action.[40]

---

**40.** The Supreme Court subsequently reversed this decision on grounds that there was an irrec-

oncilable conflict with another statute. The

See also *Cady v. Morton*, 527 F.2d 786 (9th Cir.1975); *Scientists' Institute for Public Information, Inc. v. Atomic Energy Commission*, 481 F.2d 1079 (D.C.Cir.1973).

In *NAACP v. Medical Center, Inc.*, 584 F.2d 619 (3d Cir.1978), the Third Circuit held that HUD approval of hospital construction did not amount to major federal action where the approval was a purely ministerial act. Nonetheless, the court offered a helpful analytic framework. Major federal action will exist, the court explained, where the agency approval is a legal condition precedent to the activity and where the agency has discretion in the matter. Said the court: "When the agency may act to prevent the environmental consequences of another's actions, the latter's action may be fairly considered that of the agency." *See also State of Alaska v. Andrus*, 591 F.2d 537 (9th Cir.1979).

In the present case, the BLM had authority to determine whether the stakes that were laid were within the right-of-way, whether the road improvements were reasonable and necessary under the circumstances, and whether the project would unduly degrade the WSAs. While approval of the staking was ministerial, approval of the other two issues required the application of expert judgment. District Manager Jensen expressed his expert opinion that the Burr Trail project was consistent with the BLM's plans for the area. Not only did the BLM have authority to suspend the project, but it actually did so in requiring the county to eliminate the ten non-adjoining deviations. The BLM still plans to monitor construction and to require modification where necessary.

Defendants argue that the distinguishing characteristic of federal action is not agency discretion, but executive action. They insist that major federal action exists only where the federal government has initiated the project and not where, as here, the agency is under a duty to review the project. Defendants concede, however, that major federal action would exist if the county were required to apply for a permit, even though the agency would not have

initiated the project in that case. The court feels that where an agency is engaged in decision-making, the question of major federal action cannot be resolved by so formal a distinction as the mere filing of an application.

Typically, the agency requested to prepare an EIS is not primarily concerned with environmental issues, but is nonetheless required to conduct the study to assure that these issues are given adequate consideration. It would be ironic if the very agency responsible for the public lands were not required to prepare an EIS merely because it did not initiate the project.

The court concludes, therefore, on the basis of the facts, the federal regulations, Tenth Circuit precedent and the purposes of NEPA, that the BLM's participation in the Burr Trail project is major federal action.

## B. Significant Impact

■ District Manager Jensen has expressed his opinion that the current proposal will not have a significant impact on the environment. This court must determine whether his conclusion reflects a fully informed and well-reasoned decision as evidenced by identification and discussion of the relevant environmental questions. The court finds Jensen's conclusions to be sufficiently supported by the record under this standard of review. As already explained, the court is impressed with Jensen's qualifications, experience, and familiarity with the Burr Trail, as well as his familiarity with the region, its people, economic activity, recreational uses and environmental needs.

At trial, Jensen individually identified a number of environmental effects, many of which will improve the environment. For instance, the culverts and catch basins the county plans to install will substantially improve the drainage in the area by keeping water in its natural channels, thereby reducing the erosion and soil loss which currently debilitate the environment. Engineers have testified that the drainage system was designed to minimize adverse

---

Court assumed for purposes of review that major federal action did exist.

environmental impact. Under current conditions, periodic road maintenance work is harmful to the environment. An improved road would require less maintenance and would be less degrading to the environment.

Travel safety and the quality of the transportation system will be greatly improved by the proposed construction. Although air quality and noise levels will be adversely affected by the increased traffic, greater traffic is expected even if the road is not improved. Dust caused by the construction work will be mitigated by the use of modern crushing equipment and water trucks.

The Statewide Wilderness Draft EIS (Exhibit P–28) reported that the peregrine falcon and the bald eagle are the only endangered species in the area. The bald eagle is transient through this area and would not be affected by the project. The Fish and Wildlife Service Biological Opinion (Exhibit P–43) prepared in December 1984 reports that the Burr Trail comes within a quarter mile of a 1982 peregrine falcon sighting and that the presence of the road jeopardizes the falcons' continued existence. The 1982 sighting, however, was the most recent documented sighting. There is no evidence that any falcons currently live in the area.

The Statewide Wilderness Draft EIS reported that neither WSA bordering the Burr Trail is known to contain any endangered, threatened, or sensitive plant species. Revegetation potential is considered moderately good. Expert testimony at trial, however, suggested that several endangered and sensitive plant types may exist on the trail. In fact, no plant inventory has been prepared along the Burr Trail and no one knows if any such plants are present there. Further study on this point is clearly needed.

In May of this year, P–III Associates, an archaeological testing firm, prepared a Preliminary Management Report (Exhibit P–85) for the archaeological sites along the Burr Trail. They located twenty-five prehistoric sites and examined the eleven most promising. They found nine of these to be eligible for the National Register of Historic Places under 36 C.F.R. § 60.4, and felt that most of these sites will be adversely affected by the proposed construction. They have, however, suggested several methods of mitigation which should be completed before construction proceeds.

In reaching his conclusion that the project will have no significant impact on the environment, Jensen relied in part upon the environmental studies previously conducted for similar proposed projects. On two prior occasions, the BLM has found that upgrading the Burr Trail would not significantly affect the environment. The May 1985 Environmental Assessment (Exhibit P–25) and December 1985 Finding of No Significant Impact (FONSI) (Exhibit D–6), collectively referred to as the Mott Proposal reports, evaluated four options. The first option was to widen the road to 26 feet and pave the entire route. Realignment of the road was expected in some places, as were substantial cuts and fills, installation of numerous drainage culverts, and construction of some bridges. The second option was identical to the first, except that the surface would have been gravel rather than asphalt. The third alternative provided for a gravel and dirt road that would adhere to the present alignment but would be widened in many places for safety reasons. Some filling and paving would have been done around Deer Creek and The Gulch. The fourth option considered was to leave the road as it already existed. On reviewing the Environmental Assessment, the Director of the National Park Service endorsed the third alternative, with modifications to make it an all-weather road. A Finding of No Significant Impact (FONSI) was published for that plan.

As noted in Part V of this opinion, the January 1986 Statewide Wilderness Draft EIS (Exhibit P–28) examined how closely the Wilderness Areas should be drawn to the Burr Trail and recommended pulling the Wilderness Areas back from the road a quarter mile in order to minimize a potential conflict with future realignment and

paving of the road. (Exhibit P–28, North Escalante Canyon/The Gulch ISA p. 9)[41]

The Council on Environmental Quality has published guidelines for determining whether significant impact exists. 40 C.F.R. § 1508.27. The regulations instruct the agency to consider the project in its human, societal and national context. *Id.* § 1508.27(a). They also instruct the agency to consider the severity and intensity of the impact. *Id.* § 1508.27(b). Several factors are suggested for evaluating intensity: the effect on public health and safety, the area's unique characteristics, the controversy surrounding the environmental effects, the uncertainty of the environmental risks, the project's precedential value, the likelihood that the effects will contribute to larger cumulative effects, and the effects on endangered or threatened species. The regulation also provides that "[a] significant effect may exist even if the Federal agency believes that on balance the effect will be beneficial." *Id.* § 1508.27(b)(1). The court recognizes that the Burr Trail is unique, that the project is controversial, that the beneficial effects of the project may nonetheless be significant and that the project may set precedent for future road projects. The factors listed, however, are merely guidelines. The court finds that, when viewed in a regional context, there is substantial evidence to support the conclusion that little impact is likely. The project does not call for construction of a new road, but will merely upgrade the road to accommodate anticipated traffic. The road passes through one of the least developed regions in the nation and is bounded on both sides by thousands of acres of mountains, canyons, and desert wilderness, with very few other roads passing through it. Under the BLM's stewardship, these lands will remain sufficiently desolate and pristine to be classified as Wilderness Areas.[42] The court finds that the BLM's finding of no significant impact was well within the bounds of reasoned decision-making, *Park County*, 817 F.2d at 622, and is supported by persuasive evidence.

## C. EIS Requirement Already Satisfied

■ Since the Burr Trail project will not have a significant effect on the environment, no EIS need be prepared, notwithstanding the presence of major federal action. The court notes, nonetheless, that even if significant impact were likely, preparation of an EIS at this point would be superfluous. Environmental reports previously prepared on the Burr Trail have resolved most of the issues that an EIS for the current proposal would address. All of the information that would go into an EIS, as well as the recommendations the BLM would make on the basis of that information, has already been presented to the court. These issues were the subject of exhaustive testimony at trial.[43] The trial consisted of 26 witnesses and over 250 exhibits. District Manager Jensen himself was on the stand six days, and the project's chief engineer five days. In addition, the court spent a day and a half traveling the

---

**41.** The November 1984 Draft EIS, which addressed the Hydrocarbon Lease Conversion proposal, approved the project despite an anticipated increase in truck traffic over the Burr Trail. (Exhibit DG–92)

**42.** The court notes the existence of several cases which have addressed the significant impact issue in the roadway construction context. *Cobble Hill Ass'n v. Adams,* 470 F.Supp. 1077 (E.D.N.Y.1979); *Patterson v. Exon,* 415 F.Supp. 1276 (D.Neb.1976); *Mont Vernon Preservation Soc'y v. Clements,* 415 F.Supp. 141 (D.N.H.1976); *Kisner v. Butz,* 350 F.Supp. 310 (N.D.W.Va.1972). Because of the highly fact-specific nature of the issue, however, the court does not find these cases especially helpful.

**43.** From review of these matters, the court is satisfied that the BLM's evaluation was a "comprehensive, good faith, objective, and reasonable presentation of the subject areas mandated by NEPA." *Manygoats,* 558 F.2d at 561. These subject areas which 42 U.S.C. § 4332(2)(C) says must be considered are:

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

Burr Trail and the surrounding region with Jensen, the engineer, counsel for both parties, and others. Requiring preparation of an EIS at this time would merely duplicate past efforts without enhancing the quality of the inquiry. The interests of the court and all the parties are best served by relying upon the resources which have already been prepared.

After holding that the BLM's consideration of Denver's deviation from its right-of-way triggered NEPA, the Tenth Circuit in *Denver v. Bergland*, 695 F.2d at 482, said:

The extent of [NEPA's] application must be decided in the first instance by the BLM.... That agency must decide whether the project has reached a point at which the cost of compliance with NEPA outweighs the benefits.... Even if it is decided that the balance favors compliance, the BLM yet must determine whether compliance requires an EIS.

In the present case, the BLM has already decided that an EIS is unnecessary in light of the extensive studies that have already been prepared.

A patchwork of studies sometimes will satisfy NEPA requirements even where no single study which strictly complies with the statute has been prepared for the project. In *State of Wyoming v. Hathaway*, 525 F.2d 66, 72 (10th Cir.1975), *cert. denied*, 426 U.S. 906, 96 S.Ct. 2226, 48 L.Ed.2d 830 (1976), the Tenth Circuit held that no EIS was required for an agency's prohibition of certain toxicants since a previously compiled report "was very similar in objectives and in content to an environmental impact statement." In finding that the report was the equivalent of an EIS, the court said:

Congress was seeking to require the government agencies to think about, and consider, environmental considerations in making decisions. It was not intended to force the agency to merely follow out a regimen. There are enough of these without imposing another.

In *Peshlakai v. Duncan*, 476 F.Supp. 1247 (D.D.C.1979), the court refused to enjoin a uranium exploration project even though no final EIS had been prepared. A 164–page Environmental Assessment and a Draft EIS had been compiled for the project; a general EIS had been prepared for uranium milling; and an EIS had been prepared for a similar project a few miles away. The court found that the Department of the Interior had taken the requisite "hard look" at the environmental consequences of the project, noting that "it is appropriate also to consider whether the effect of a NEPA injunction would be to vitiate other congressionally-mandated policies." *Id.* at 1262.

The Ninth Circuit, balancing the equities pursuant to a preliminary injunction motion in *Sierra Club v. Hathaway*, 579 F.2d 1162 (9th Cir.1978), held that no EIS was needed for the particular project where a programmatic EIS had been prepared for the region and an Environmental Analysis Record had also been compiled. The court found that the agency had made a good faith attempt to comply with NEPA. *See also Friends of the Earth, Inc. v. Coleman*, 518 F.2d 323, 330 (9th Cir.1975).

And in *Kisner v. Butz*, 350 F.Supp. at 310, the court had before it no administrative record to review the agency's decision not to prepare an EIS. The court found, however, that the testimony at trial provided it with "a full and effective judicial review of the 'mental processes' of the administrative decision makers."

In the present case, the November 1984 Hydrocarbon Draft EIS, the May 1985 Environmental Assessment (Exhibit P–25) and December 1985 FONSI (Exhibit D–6), and the January 1986 Statewide Wilderness Draft EIS (Exhibit P–28), help to establish the substantial equivalent of an EIS. Although these reports alone probably would not be the equivalent of a specific EIS for the present project, when they are supplemented by the evidence adduced at trial, the court has no doubt that it has reviewed the substantial equivalent of an Environmental Impact Statement.

The Council on Environmental Quality has published regulations on compliance with NEPA. They instruct the agency to minimize paperwork and delay. "NEPA's purpose is not to generate paperwork— even excellent paperwork—but to foster

excellent action." 40 C.F.R. § 1500.1(c). Specifically, agencies are authorized to eliminate duplication by adopting documents of other agencies. *Id.* §§ 1500.4(n) and (o). In *National Helium Corp. v. Morton,* 486 F.2d 995, 1002 (10th Cir.1973), the court held that the sufficiency of an EIS should be tested under a rule of reason. The court went on to explain:

> ... The requirement should not be viewed as necessitating that the completion of an impact statement be unreasonably or interminably delayed in order to include all potential comments or the results of works in progress which might shed some additional light on the subject of the impact statement. Such a result would often inordinately delay or prevent any decision in environmental cases. The courts should look for adequacy and completeness in an impact statement, not perfection.

*Id.* at 1004. *See also, Save Our Invaluable Land (SOIL), Inc., v. Needham,* 542 F.2d 539 (10th Cir.1976).

Although the court holds that no EIS has to be prepared, it feels that the uncertainty surrounding possible endangered plants in the area requires completion of these studies before construction may proceed.

Also, such mitigative measures as the BLM decides are appropriate should be performed at the archaeological sites before construction may proceed. In their Preliminary Management Report, P–III Associates said that the best method of archaeological mitigation is rerouting the trail. Acknowledging that this was not feasible, they advised minimizing construction at five of the sites and mitigative excavation at eight of the sites except those, if any, at which it is shown construction will result in no damage to the sites. If any sites are to be avoided, they note, a professional archaeologist should monitor the construction in those areas. The BLM has accepted and endorsed this report.

## VII. OTHER COUNTERCLAIMS OF DEFENDANT GARFIELD COUNTY

### A. Interference with Business Contract

Defendants claim that plaintiffs brought the present suit without any legit-imate basis, intending to delay the Burr Trail project, making false statements about the validity of Garfield County's right-of-way, and intentionally interfering with Garfield County's contractual relations. The court feels, however, that the application for an injunction and the evidence adduced were sincerely and properly presented. Each side represented a genuine public interest and raised serious questions of law and fact. Garfield County's claim of intentional interference with contract should, therefore, be denied.

### B. Claim for Damages

In issuing the preliminary injunction, the court required plaintiffs to post a $10,000.00 injunction bond. Garfield County now requests damages to compensate it for the construction delays resulting from this litigation. The granting of damages under an injunction bond is discretionary with the trial court and should be based upon considerations of equity and justice. *State of Kansas, ex rel. Stephan v. Adams,* 705 F.2d 1267, 1269 (10th Cir.1983). That a bond has been required in connection with the issuance of a preliminary injunction does not mean that damages must automatically be awarded under the bond without consideration of the equities of the case. *Id.* at 1269. In the present case the court feels that plaintiffs raised legitimate environmental concerns having a high public interest and litigated in good faith. Garfield County's claim for damages should, therefore, be denied.

## VIII. CONCLUSIONS

The court concludes, therefore:

1. That Garfield County holds a valid right-of-way over the Burr Trail road pursuant to R.S. 2477 (Part III of this opinion), and that, under Utah law, Garfield County may improve the roadway in a manner which is reasonable and necessary under the circumstances (Part IV of this opinion).

2. That the county's right-of-way is a valid existing right under FLPMA in those

sections where it passes between the Wilderness Study Areas, and that the road may intrude into the Study Areas as long as it is reasonable and necessary to do so under the circumstances and does not unnecessarily or unduly degrade the Study Areas. (Part V of this opinion)

3. That all of the construction now proposed is reasonable and necessary given the current condition of the road and the increasing traffic. All of the proposed construction is therefore within Garfield County's right-of-way. Except for the riparian area in The Gulch, the project will not unnecessarily or unduly degrade the Study Areas. (Parts IV and V of this opinion)

4. That the BLM's participation constitutes major federal action under NEPA, but that the project will not have a significant impact on the quality of the human environment. Hence, no Environmental Impact Statement need be prepared. Moreover, the materials previously prepared and the evidence adduced at trial are the substantial equivalent of an EIS. Consequently, no EIS would have to be prepared even if significant impact did exist. (Part VI of this opinion)

5. That the BLM and this court, under the facts and the applicable law, have no authority to make any order with respect to the state section of land traversed by the road.

6. At trial the court dismissed the plaintiffs' statute of limitations claim under 28 U.S.C. § 2401(a) and defendants' statute of limitations claim under 28 U.S.C. § 2409a(f).

7. That Garfield County's claim for damages from plaintiffs for improperly requesting a preliminary injunction, interfering with contractual relations and making false statements about the validity of the county's right-of-way are not supported by the facts and the law.

8. That damages for the construction delays resulting from this litigation are not properly awardable to Garfield County on the facts of this case.

THE COURT WILL, THEREFORE, ENTER ITS ORDER AND JUDGMENT RULING:

1. That the plaintiffs' request for a permanent injunction be denied and that the preliminary injunction herefore entered by this court be lifted.

2. That the identified botanical studies be conducted to the BLM's satisfaction, that the identified archaeological sites along the Burr Trail be mitigated to the BLM's satisfaction, and that Garfield County apply to the BLM for a permit to move the road from the riparian area in The Gulch up onto the bench, as suggested by the BLM.

3. That Garfield County may proceed with the proposed construction as presented in Exhibit D–38A in those areas unaffected by paragraph 2. As the matters presented in paragraph 2 are satisfactorily completed, construction may proceed in those areas. Consistent with its duty, the BLM shall monitor the construction as it proceeds.

4. That plaintiffs' request for relief in the state section be denied.

5. That defendant Garfield County's claims for damages from plaintiffs for improperly requesting a preliminary injunction, delaying construction, interfering with contractual relations and making false statements about the validity of the county's right-of-way be denied.

APPENDIX

EXHIBIT P-25 **VICINITY**

3-a

PROJECT LOCATION MAP
EXHIBIT P-30
Exhibit IV-1

BOULDER-BULLFROG SCENIC ROAD